3 A.3d 535 (2010)
416 N.J. Super. 30
Koral MOORE, a minor, by and through her Guardians ad Litem, Monica Moore & Kevin Moore and Monica & Kevin Moore, Individually, Plaintiffs-Appellants,
v.
WOMAN TO WOMAN OBSTETRICS & GYNECOLOGY, L.L.C., and Lisa Vernon, M.D., Defendants, and
Carlos Fernandez, M.D., and Premier Perinatal, L.L.C., Defendants-Respondents.
Docket No. A-0953-09T1
Superior Court of New Jersey, Appellate Division.
Submitted June 8, 2010.
Decided August 18, 2010.
*537 Weiss & Paarz, attorneys for appellants (Robert Paarz, of counsel; Pamela Brown-Jones, on the brief).
Hardin, Kundla, McKeon & Poletto, P.A., attorneys for respondents (Jeffrey A. Oshin, Springfield, on the brief).
Britcher, Leone & Roth, L.L.C.b, attorneys for amicus curiae New Jersey Association for Justice (E. Drew Britcher, Glen Rock, and Jessica E. Choper, on the brief).
Brach Eichler, L.L.C., attorneys for amicus curiae Medical Society of New Jersey (John D. Fanburg and Joseph M. Gorrell, of counsel; Mr. Gorrell and Lauren D. Fuhrman, Princeton, on the brief).
Before Judges GRALL, MESSANO and LeWINN.
The opinion of the court was delivered by
GRALL, J.A.D.
Plaintiffs Monica and Kevin Moore are the parents of Koral Moore, who has Down Syndrome. Due to Monica's age, her pregnancy was considered high risk. Her doctor, defendant Lisa Vernon, M.D., practicing with defendant Woman to Woman Obstetrics & Gynecology, L.L.C., referred Monica to defendants Carlos Fernandez, M.D., and Premier Perinatal, L.L.C. (Premier). Plaintiffs filed a complaint alleging medical malpractice and seeking damages, including special damages for extraordinary medical expenses that will be incurred by Monica and Kevin during the child's infancy and by Koral thereafter.
This is an appeal from orders compelling arbitration of all three plaintiffs' claims against defendants Dr. Fernandez and Premier. Relying on an arbitration agreement signed by Monica Moore and Dr. Fernandez on Monica's first visit, which was on June 13, 2008, defendants Dr. Fernandez and Premier moved to dismiss the complaint for failure to state a claim. R. 4:6-2(e). Due to defendants' reliance on matters outside the pleadings, the judge treated the motion as one for summary judgment. R. 4:6-2. For reasons stated on the record and in a written memorandum dated July 31, 2009, the judge entered an order compelling arbitration of plaintiffs' claims against Dr. Fernandez and Premier and dismissing the complaint without prejudice as to those defendants. The judge stayed the order for sixty days to permit plaintiffs to file an interlocutory appeal and to supplement the record with an additional certification. On August 11, 2009, plaintiffs moved for reconsideration. Dr. Fernandez and Premier opposed that motion, and the judge denied it for reasons stated on the record on September 11, 2009. The July 31 and September 11 orders do not address plaintiffs' claims against defendants Woman to Woman Obstetrics & Gynecology, L.L.C., and Lisa Vernon, M.D.
On plaintiffs' motion for leave to appeal, we followed Wein v. Morris, 194 N.J. 364, 380, 944 A.2d 642 (2008), and entered an order directing that the notice of motion be deemed a notice of appeal. We subsequently entered orders permitting both the New Jersey Association for Justice (the Association) and the Medical Society of New Jersey (the Society) leave to file a brief as amicus curiae.

*538 I
Plaintiffs and the Association urge us to hold that all pre-dispute agreements to submit medical malpractice claims to binding arbitration are unenforceable. Their arguments are fairly summarized as follows: pre-dispute agreements to arbitrate medical malpractice claims are necessarily unconscionable contracts of adhesion; the waiver of rights of access to the court entailed in pre-dispute agreements to arbitrate medical malpractice claims cannot be knowing and voluntary; and the "undemocratic character" of arbitration's flexible rules and its closed proceedings will lead to distrust in the courts.
In essence these arguments for a general rule prohibiting pre-dispute arbitration agreements are based on the nature of the relationship between a doctor and patient; the importance of medical services and the state of mind of persons who seek them; the general fairness of pre-dispute arbitration agreements; and the wisdom of arbitration in general. These are questions of policy.
In our view, the Legislature has resolved these questions in the Arbitration Act, L. 2003, c. 95 (codified as N.J.S.A. 2A:23B-1 to -32). The Legislature's approval of arbitration agreements is broad. Subsection a of N.J.S.A. 2A:23B-6 provides: "An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." (emphasis added). This provision clearly encompasses pre-dispute agreements to arbitrate.
Moreover, the Act does not prohibit agreements to arbitrate based upon the nature of the disputed claim. While the Legislature has excluded arbitration of certain labor disputes from the provisions of the Act, N.J.S.A. 2A:23B-3a, it has not prohibited arbitration of those labor disputes.
Finally, the Legislature has not overlooked cases in which a purported agreement to arbitrate should not be enforced because there was no agreement to arbitrate or because there are grounds to revoke an agreement to arbitrate. As discussed in the paragraphs that follow, the Act requires courts to address those issues on a case-by-case basis.
Arbitration is "`a creature of contract.'" Fawzy v. Fawzy, 199 N.J. 456, 469, 973 A.2d 347 (2009) (quoting Kimm v. Blisset, LLC, 388 N.J.Super. 14, 25, 905 A.2d 887 (App.Div.2006), certif. denied, 189 N.J. 428, 915 A.2d 1051 (2007)). An agreement to arbitrate is "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." N.J.S.A. 2A:23B-6a (emphasis added).
"The court shall decide whether an agreement to arbitrate exists. ..." N.J.S.A. 2A:23B-6b. An agreement to arbitrate a claim must be a valid agreement. See Muhammad v. County Bank of Rehoboth Beach, De., 189 N.J. 1, 12, 912 A.2d 88 (2006) (noting the existence of "a valid arbitration agreement" is a "gateway" question requiring "judicial resolution" (internal quotations omitted)), cert. denied, 549 U.S. 1338, 127 S.Ct. 2032, 167 L.Ed.2d 763 (2007). Moreover, the court must decide whether there is a "ground that exists at law or in equity for the revocation of a contract." N.J.S.A. 2A:23B-6a.[1]
*539 Courts decline to enforce an arbitration agreement that is not sufficiently clear as to the rights the party is waiving. "`In the absence of a consensual understanding, neither party is entitled to force the other to arbitrate their dispute.'" Fawzy, supra, 199 N.J. at 469, 973 A.2d 347 (quoting In re Arbitration Between Grover & Universal Underwriters Ins. Co., 80 N.J. 221, 228-29, 403 A.2d 448 (1979)). This requirement of a "consensual understanding" about the rights of access to the courts that are waived in the agreement has led our courts to hold that clarity is required. See id. at 469-70, 973 A.2d 347. Thus, "`[a] clause depriving a citizen of access to the courts should clearly state its purpose. The point is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue.'" Id. at 469, 973 A.2d 347 (quoting Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282, 633 A.2d 531 (1993)).
In considering the law and equity relevant to enforcement of an agreement to arbitrate as contemplated by subsection a of N.J.S.A. 2A:23B-6, courts may decline to enforce when well-established principles addressing the absence of a consensual agreement and unfairness in contracting and the agreement warrant relief. Those principles include fraud, duress, mistake, illegality, imposition, undue influence and unconscionability. Muhammad, supra, 189 N.J. at 12, 15, 912 A.2d 88; Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992).
Undue influence warrants avoidance when "by virtue of the relation between [the parties, the party seeking to avoid enforcement was] justified in assuming that that person will not act in a manner inconsistent with his [or her] welfare." Restatement (Second) of Contracts § 177(1) (1981). The relationship between physician and patient is one that the comment indicates is within the purview of Section 177. Id. at cmt. a to § 177.
The Supreme Court addressed unconscionability in the context of contracts of adhesion in Muhammad and Rudbart. Muhammad, supra, 189 N.J. at *540 18, 912 A.2d 88; Rudbart, supra, 127 N.J. at 353-56, 605 A.2d 681. Contracts of adhesion are unique. "[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the adhering party to negotiate except perhaps on a few particulars." Rudbart, supra, 127 N.J. at 353, 605 A.2d 681 (internal quotations omitted). A contract of adhesion is "`[a] contract where one party ... must accept or reject the contract. ...'" Ibid. (quoting Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 104, 415 A.2d 1156 (1980)). "Such a contract `does not result from the consent of that party.'" Ibid. Consequently, a "distinct body of law surrounding contracts of adhesion" has developed "to determine whether and to what extent such nonconsensual terms will be enforced." Id. at 353-54, 605 A.2d 681.
"For the most part, the unconscionability [involves] two factors: (1) unfairness in the formation of the contract, [procedural unconscionability] and (2) excessively disproportionate terms[, substantive unconscionability]." Sitogum Holdings, Inc. v. Ropes, 352 N.J.Super. 555, 564, 800 A.2d 915 (Ch.Div.2002); see Muhammad, supra, 189 N.J. at 15, 912 A.2d 88 (discussing Sitogum and employing the terms "procedural" and "substantive" unconscionability). "Because adhesion contracts invariably evidence some characteristics of procedural unconscionability,... a careful fact-sensitive examination into substantive unconscionability" is generally required. Muhammad, supra, 189 N.J. at 16, 912 A.2d 88. Nonetheless, while substantive unconscionability is the focus when the contract is one of adhesion, "overwhelming procedural unconscionability" is considered and the relevant facts are "included and weighed in the overall analysis for unconscionability." Id. at 16 n. 3, 912 A.2d 88; see Delta Funding Corp. v. Harris, 189 N.J. 28, 39-40, 912 A.2d 104 (2006). Thus, "[w]hen making the determination that a contract of adhesion is unconscionable and unenforceable, we consider, using a sliding scale analysis, the way in which the contract was formed and, further, whether enforcement of the contract implicates matters of public interest." Stelluti v. Casapenn Enters, LLC, 203 N.J. 286, 301 & n. 10, 1 A.3d 678 (2010).
Factors relevant to unconscionability include characteristics of the party presented with a contract of adhesion, "such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." Sitogum, supra, 352 N.J.Super. at 564, 800 A.2d 915. The "setting existing" is sufficiently broad to warrant consideration of facts such as the relationship between the parties and the services at issue. See Muhammad, supra, 189 N.J. at 15-16, 912 A.2d 88 (noting the relevance of "`[ (1) ] the subject matter of the contract, [(2)] the parties' relative bargaining positions, [ (3) ] the degree of economic compulsion motivating the "adhering" party, and [ (4) ] the public interests affected by the contract'") (quoting Rudbart, supra, 127 N.J. at 356, 605 A.2d 681); see also Stelluti, supra, 203 N.J. at 301, 1 A.3d 678 (approving consideration of those factors).
Considering the breadth of the foregoing principles relevant to enforcement of an agreement to arbitrate, the policies upon which plaintiffs and the Association rely to urge adoption of a per se rule barring pre-dispute agreements to arbitrate claims of medical malpractice are reasonably addressed by the case-by-case approach the Legislature has directed. For that reason, we see no justification for judicial action imposing an absolute bar to *541 enforcement of agreements to arbitrate such claims. The question is best left to the Legislature.
In Fawzy, the Supreme Court considered whether to bar arbitration of custody claims and held that parents may agree to arbitrate questions concerning custody of their children subject only to a special standard for judicial review of the arbitrator's decision to prevent "harm" to the child that warrants interference with parental autonomy. 199 N.J. at 471-80, 973 A.2d 347. The Court looked to the Act and relied, in part, on the Legislature's broad approval of arbitration pursuant to consensual agreement and the absence of an exception for custody disputes. Id. at 469-71, 973 A.2d 347. Our decision to reject a per se rule the Legislature has not adopted is consistent with Fawzy.

II
We turn to consider whether it was error to compel arbitration pursuant to the pre-dispute agreement signed by Monica Moore and Dr. Fernandez. Because the orders were entered on defendants' motion for summary judgment, we apply the same standards as the trial court. Kramer v. Ciba-Geigy Corp., 371 N.J.Super. 580, 602, 854 A.2d 948 (App. Div.2004). The facts and reasonable inferences must be considered in the light most favorable to plaintiffs, the non-prevailing parties, and the question is whether defendants were entitled to an order enforcing the agreement as a matter of law. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Viewed in that light, these are the pertinent facts. Monica's first appointment with Dr. Fernandez at Premier was on June 13, 2008. She was to be given an ultrasound due to her high-risk pregnancy. Monica's grandson, his mother and Monica's seven-and five-year-old sons were with her. The receptionist gave Monica a clipboard with forms she was to complete. Monica recalls a "medical questionnaire" and "forms concerning privacy and, finances or that sort of thing." She was focused on completing the forms so she could have the test and get her grandson's mother to her doctor's appointment. No one brought her attention to the arbitration agreement. Although Monica does not recall seeing or signing the arbitration agreement, she acknowledges that it bears her signature and is dated June 13, 2008. Monica was not given a copy of the agreement after she signed it or when she left the office.
The arbitration agreement is four pages. The title is in bold-face type and capitalized letters, "ARBITRATION AGREEMENT FOR CLAIMS ARISING OUT OF OR RELATED TO MEDICAL CARE AND TREATMENT." Monica filled in the date, her name and her address in the blanks directly below the title. The "whereas" clauses of the agreement purport to memorialize the patient's desire to engage the "Medical Care Provider to provide medical care and treatment"; the Medical Care Provider's "request[] that the Patient agree that any claims arising out of or related to the medical care and treatment ... be resolved by binding arbitration"; the Medical Care Provider's "submi[ssion] to the Patient [of] the names of physicians who provide services ... and who do not require that their patients agree to arbitrate" such claims; and the Patient's "hav[ing] informed the physician that she nevertheless desires to receive medical care and treatment" and agrees that such claims "will be resolved by binding arbitration."
In pertinent part, the agreement provides:

*542 1. AGREEMENT TO ARBITRATE CLAIMS REGARDING FUTURE CARE AND TREATMENT
(a) Patient and Medical Care Provider agree that any controversy arising between them including, without limitation, claims for medical malpractice, personal injury ... emotional distress ... or any other claims of any kind or nature whatsoever arising out of or in any way related to the diagnosis, treatment or medical care of the Patient by the Medical Care Provider shall be resolved only by binding arbitration conducted in accordance with the provisions of this Agreement.
(b) The Patient's agreement to submit any and all such claims to binding arbitration shall be binding on the Patient, his or spouse, the Patient's children (born or unborn). ...
(c) The Patient's agreement to submit to arbitration all claims of any kind or nature arising out of or related to the diagnosis, treatment or medical care provided by the Medical Care Provider shall also include claims against any other medical care provider ... that has provided diagnosis, treatment or medical care in conjunction with, or that is causally related to the diagnosis, treatment and medical care provided to the Patient by the Medical Care Provider ...; provided, however, that in the event any such medical care provider ... shall not agree to participate in binding arbitration... the Patient shall have the right to pursue claims against [that provider] in a court of competent jurisdiction. ...
.... [An agreement to arbitrate claims for past care and treatment is omitted.]
3. WAIVER OF RIGHT TO JURY TRIAL
The Patient and the Medical Care Provider acknowledge that by agreeing to resolve any and all claims ... by binding arbitration, they are abandoning their constitutional right to have such claims or controversies resolved by a jury in a court of law. Both parties acknowledge that they have a full appreciation and understanding of the right to a jury trial that they are abandoning and both the Patient and the Medical Care Provider acknowledge that they are abandoning that right voluntarily and willingly.
.... [Paragraphs 4-7, addressing, respectively, the statute of limitations, collateral source rule, payment and selection of arbitrators and a limitation on punitive damages, are omitted.]
8. RIGHT TO COUNSEL
The Patient acknowledges that this Agreement in a legal document with binding consequences and that the patient has been afforded the right to consult with an attorney prior to entering into this Agreement. The Medical Care Provider expressly encourages the Patient to consult with an attorney before entering into this Agreement.
9. MISCELLANEOUS ITEMS
. . . .
(e) Patient's Right to Rescind Agreement. The Patient acknowledges that, notwithstanding the Patient's execution of this Agreement, the Patient retains the right to cancel and rescind the Agreement within 15 days of the date of execution by providing written notice to the Medical Care Provider. Such notice shall be provided by returning a copy of this Agreement to the Medical Care Provider with the word "cancelled" written across the first page thereof and signed by the Patient.
Immediately above the signature line the following notice was provided: NOTICE: BY SIGNING THIS CONTRACT, YOU ARE AGREEING TO *543 HAVE ANY ISSUE OF ALLEGED MEDICAL NEGLIGENCE OR BREACH OF CONTRACT BETWEEN YOU AND YOUR MEDICAL CARE PROVIDER DECIDED BY A BINDING ARBITRATION PROCESS IN WHICH BOTH PARTIES ARE GIVING UP THEIR RIGHT TO A TRIAL BY JURY, OR A TRIAL BY JUDGE.
At the bottom of the same page beneath the signature lines that warning is repeated as follows:
BY ENTERING INTO THIS AGREEMENT, THE PATIENT AND THE MEDICAL CARE PROVIDERS ARE WAIVING ALL RIGHTS TO A JURY TRIAL IN A COURT OF COMPETENT JURISDICTION AND ARE AGREEING TO RESOLVE BY BINDING ARBITRATION ALL DISPUTES ARISING OUT OF OR RELATED TO [A] PATIENT'S DIAGNOSIS, MEDICAL CARE AND TREATMENT.
As noted above, Monica asserted, and defendants do not dispute, that she did not receive a copy of the agreement. She also claims that she did not receive the list of doctors referenced in the "whereas" clause or a cover letter explaining Premier's policy on arbitration. Dr. Fernandez contended that Monica was provided with both the cover letter and the list, but defendants acknowledge that for purposes of summary judgment that factual dispute must be resolved in Monica's favor.
Plaintiffs contend that the agreement was not sufficiently clear to permit a finding that she knowingly agreed to waive her rights of access to the courts. Her argument is not directed to the right to a trial but to the limited scope of judicial review of an arbitrator's award. Plaintiffs point to the absence of information about the limited right of judicial review mentioned in Fawzy.
We do not read Fawzy as holding that every party to an agreement to arbitrate must be specifically advised of "the limited circumstances under which a challenge to the arbitration award may be advanced and agree to those limitations. ..." 199 N.J. at 482, 973 A.2d 347. In the section of Fawzy referencing the importance of that information, the Court discusses "how parents may exercise their rights and bind themselves to arbitrate a child-custody dispute." Id. at 481, 973 A.2d 347. In that context, the Court refers not only to the statutory limitations but also to a standard for judicial review that is not incorporated in the Arbitration Act and is uniquely applicable in cases involving parental autonomy. Id. at 480-81, 973 A.2d 347. In the context of custody disputes, constitutional rights beyond litigation rights are at issue. Thus, while this agreement does not include information on the limitations on judicial review, we cannot conclude that the omission of information set forth in N.J.S.A. 2A:23B-22 to -24 is an automatic bar to enforcement of an agreement to arbitrate tort claims. This arbitration agreement gave sufficient notice of the trial rights that Monica was waiving.
Nonetheless, defendants were not entitled to summary judgment as a matter of law on the question of unconscionability. There are several factors of procedural and substantive unconscionability that combine to preclude entry of an order enforcing the agreement at this juncture. As noted above, our courts use "a sliding scale analysis" and consider "the way in which the contract was formed and, further, whether enforcement of the contract implicates matters of public interest." Stelluti, supra, 203 N.J. at 301 & n. 10, 1 A.3d 678.
The factors to which we refer are "the particular setting existing during the contract formation process" and the waivers *544 that involve others who are not parties to the agreement. Sitogum, supra, 352 N.J.Super. at 564, 800 A.2d 915. In the context of a contract of adhesion, which this contract clearly is, the "subject matter" and the "parties' relative bargaining positions" as well as public policies implicated are pertinent. Muhammad, supra, 189 N.J. at 15-16, 912 A.2d 88.
Monica sought medical services from a specialist for a high-risk pregnancy. In that circumstance, it was reasonable for Monica to assume that the physician was acting in her interest. She was presented, along with forms related to medical treatment and privacy rights and payment for the services, a copy of a contract of adhesion that is a pre-dispute arbitration agreement. Apart from the plain, prominent and unambiguous text of the agreement, she was not alerted to the fact that a contract waiving her rights and the rights of her husband and child was among those forms.
The contract of adhesion Monica signed gave her notice of her right to seek the advice of counsel and a right to withdraw from the agreement within fifteen days. Nonetheless, Monica was not given a copy of the agreement, which was essential to the exercise of those contractual rights. Thus, while these provisions of the agreement suggest procedural fairness through an effort to ensure that that the agreement is accepted with full understanding and after thoughtful consideration over a fifteen-day period, the failure to provide the patient with a copy of the contract, as a practical matter, renders them ineffective and gives rise to an inference of additional inequality in the parties' respective bargaining positions.
While arbitration has been approved by the Legislature and, for that reason, cannot be deemed inconsistent with public policy, the waivers exacted in this agreement are overreaching in one aspect. This agreement to arbitrate includes waivers of the rights of persons who are not parties to the agreement  the patient's spouse and unborn child. Those provisions are not agreements to "submit to arbitration any existing or subsequent controversy arising between the parties to the agreement...." N.J.S.A. 2A:23B-6a. While the Supreme Court has held that a parent may "bind a minor child to arbitrate future tort claims," Hojnowski v. Vans Skate Park, 187 N.J. 323, 343, 901 A.2d 381 (2006), we are not aware of any legal theory that would permit one spouse to bind another to an agreement waiving the right to trial on his or her claim without securing his consent to the agreement.
We disagree with the trial court's legal conclusion that Monica could waive her husband's right to a trial because his claim is "derivative" of hers. The claim asserted by Kevin, as husband of Monica and father of Koral, is an individual claim. Procanik by Procanik v. Cillo, 97 N.J. 339, 348, 478 A.2d 755 (1984) (describing wrongful birth as a "cause of action of parents who claim that the negligent advice or treatment deprived them of [a] choice"). This is not to say that a medical care provider is precluded from conditioning the provision of obstetrical care on an agreement to arbitrate accepted by both parents, but that is not what was done here.
This agreement also includes a one-sided waiver of rights to adjudicate claims against other medical care providers who are not parties to the agreement. Those other health care providers, but not the patient, can decline to arbitrate.
Under the totality of the circumstances in this case, defendants were not entitled to summary judgment enforcing this agreement over plaintiffs' claims that this contract of adhesion was procedurally and substantively unconscionable.
The order granting summary judgment and dismissing, without prejudice, plaintiffs' *545 claims against defendants Dr. Fernandez and Premier is reversed. The matter is remanded for further proceedings.
NOTES
[1] In contrast, pursuant to subsection c of N.J.S.A. 2A:23B-6, the "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled and whether a contract containing a valid agreement to arbitrate is enforceable." (emphasis added). As the emphasized language indicates, subsection c assumes that any dispute about the validity of the agreement to arbitrate has been resolved by the court. N.J.S.A. 2A:23B-6 is identical to Section 6 of the Uniform Arbitration Act (UAA) (2000). As the official comment to Section 6 of the UAA explains, the arbitrator's authority under subsection c encompasses matters of procedural prerequisites relevant to arbitration proceedings "such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate. ..." UAA, Section 6: Validity Of Agreement To Arbitrate, cmt. 2. The Commissioners' comments to the UAA are available at http://www.law.upenn.edu/bll/archives/ulc/ uarba/arb1031.htm. With exceptions expressly noted, the sponsor of New Jersey's Act endorsed the Commissioners' Official Comments. See Note to N.J.S.A. 2A:23B-1 (quoting Assembly Judiciary Committee Statement to S. 514-L.2003, c. 95).

The Commissioners' comment makes it clear that subsection c of Section 6 is not intended to limit the court's authority to determine questions of fraud, illegality, mutual mistake, duress or unconscionability relevant to the agreement to arbitrate. They explain: "The language in section 6(c), `whether a contract containing a valid agreement to arbitrate is enforceable,' is intended to follow the `separability' doctrine outlined in Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395 [87 S.Ct. 1801, 18 L.Ed.2d 1270] (1967)." Id. at cmt. 4. In Prima Paint, the Court distinguished claims of fraud in the inducement related "to the arbitration clause itself  an issue which goes to the `making' of the agreement to arbitrate " and should be adjudicated by the courts from claims of fraud in the inducement of the contract in general, an issue which should be addressed by the arbitrator. 388 U.S. at 403-04, 87 S.Ct. 1801.