24 A.3d 777

NAACP OF CAMDEN COUNTY EAST, AND GERALDINE THOMAS, ON BEHALF OF THEMSELVES AND ALL SIMILARLY SITU-ATED, PLAINTIFFS-APPELLANTS, v. FOULKE MANAGE-MENT CORP., DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 4, 2010—Decided August 2, 2011.

406

408

Before Judges LISA, SABATINO, and ALVAREZ.

*Charles N. Riley* and *Philip B. Seaton* argued the cause for appellants.

*Jeffrey S. Craig* and *Laura D. Ruccolo* argued the cause for respondent (*Wardell, Craig, Annin & Baxter, LLP* and *Capehart & Scatchard, P.A.*, attorneys; *Ms. Ruccolo*, of counsel; *Mr. Craig, Domenic B. Sanginiti, Jr.*, and *Ms. Ruccolo*, on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

This appeal concerns the enforceability of arbitration provisions contained in various form documents that a consumer signed in connection with her purchase of a new motor vehicle from a New Jersey dealership. After making her purchase and disputing several charges that the dealership had billed her, the consumer and a local chapter of the National Association for the Advancement of Colored People ("NAACP") brought a class action against the dealership in the Law Division. Plaintiffs' complaint alleged that the dealership violated numerous statutory provisions and, in particular, that the arbitration provisions in the form documents were unenforceable.

After the court dismissed the NAACP chapter for lack of standing, the consumer moved for partial summary judgment on

several grounds. The dealership cross-moved to dismiss the complaint and refer the dispute to binding arbitration. Following a plenary hearing, the trial court denied plaintiffs' motion and granted the dealership's cross-motion to refer the matter to arbitration.

For the reasons stated in this opinion, we affirm the trial court's disposition in part, reverse it in part, and remand for further proceedings. In particular, we uphold the court's specific ruling that the class action waiver provisions in the contract documents should not be invalidated on public policy grounds, a conclusion that is in keeping with the United States Supreme Court's recent decision in *AT&T Mobility LLC v. Concepcion,* 563 *U.S.* ——, 131 *S.Ct.* 1740, 179 *L.Ed.*2d 742 (2011). However, we also conclude that the disparate arbitration provisions in this case were too confusing, too vague, and too inconsistent to be enforced, and we therefore reverse the trial court's dismissal of the complaint directing the parties to binding arbitration. We also vacate, subject to further development of the facts, the court's dismissal of the NAACP chapter for lack of standing.

## I.

This case arises out of the routine purchase of a new car, and a stack of form documents that the dealership required the consumer to sign before making that purchase. Because the parties each moved for summary judgment and the case was dismissed before trial, the record is not fully developed. We summarize the portions of the record most pertinent to our analysis of the legal issues raised on appeal.

Defendant, Foulke Management Corporation, owns and operates several motor vehicle dealerships in Southern New Jersey, including the Cherry Hill Triplex. On May 19, 2007, plaintiff Geraldine Thomas,[1] a resident of Clementon, went to the Cherry

---

[1] Although the NAACP of Camden County East was named in the amended complaint as a co-plaintiff, we will refer to Thomas, the vehicle purchaser, as "plaintiff" unless otherwise indicated.

Hill Triplex, intending to purchase a vehicle. She was prompted to go there after seeing a television advertisement in which the dealership guaranteed financing, without any money down, regardless of a consumer's credit history.

Plaintiff is African–American and a member of the NAACP. She has ten years of formal schooling. At the time of her transaction with defendant, she was employed as a healthcare worker earning approximately ten dollars per hour. When she filed a certification with the trial court in July 2008, plaintiff was age sixty-five. By that point she had retired, supporting herself with Social Security benefits and a pension of $290 per month.

Plaintiff decided to trade in her 2002 Chevrolet Cavalier in order to purchase a new 2007 Kia Sportage. As displayed on the vehicle's window sticker, the manufacturer's suggested retail price ("MSRP") for the Sportage was $19,575. According to plaintiff, defendant's salesperson offered her a trade-in amount of $5,000 for her Cavalier, plus a $1,000 rebate. The salesperson allegedly told her that her monthly payments would be $398.47. Plaintiff agreed to those basic terms and signed numerous form documents, including: (1) a retail installment contract (the "RIC"); (2) a so-called GAP addendum (the "Addendum"); (3) a separate arbitration document (the "SAD"); (4) a general consumer notice (the "consumer notice"); (5) a motor vehicle retail order agreement (the "MVROA"); (6) a document containing certain waivers by the purchaser (the "waiver document"); and (7) a spot delivery agreement (the "spot delivery agreement"). The first three of these documents [2] contained arbitration provisions. We describe and quote relevant passages from each of them.

---

[2] According to plaintiffs, the total contents of the RIC, the Addendum, and the SAD are the equivalent of "44 single[-]spaced 8[½] [inch] × 11 [inch] pages." Plaintiffs' automotive expert estimates that these three documents, together with the other four documents signed by the consumer, contain approximately 10,000 words.

*The RIC*

The RIC contained language, in capitalized bold print and immediately above one of the buyer's signature lines, which stated:

**BUYER ACKNOWLEDGES RECEIPT OF A TRUE AND COMPLETELY FILLED IN COPY OF THIS RETAIL INSTALLMENT CONTRACT. IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT, INCLUDING THE IMPORTANT ARBITRATION DISCLOSURES AND PRIVACY POLICY ON THE BACK OF THIS CONTRACT.**

On the back of the RIC, under a heading entitled "Important Arbitration Disclosures," the following language appeared:

**21. ARBITRATION. The following Arbitration provisions significantly affect your rights in any dispute with us. Please read the following disclosures and the arbitration provision that follows carefully before you sign the contract.**

1. If either you or we choose, *any dispute between you and us will be decided by arbitration and not the court.*

2. If such dispute is arbitrated, you and we will give up the right to trial by a court or a jury trial.

3. *You agree to give up any right you may have to bring a class-action lawsuit or class arbitration, or to participate in either as a claimant,* and you agree to give up any right you may have to consolidate your arbitration with the arbitration of others.

4. The information that can be obtained in discovery from each other or from third persons in arbitration is generally more limited than in a lawsuit.

5. Other rights that you and/or we would have in court may not be available in arbitration.

*Any claim or dispute,* whether in contract, tort or otherwise (including any dispute over the interpretation, scope, or validity of this contract, arbitration section or the arbitrability of any issue), between you and us . . . which arises out of or relates to a credit application, this contract, or any resulting transaction or relationship arising out of this contract *shall, at the election of either you or us . . . be resolved by a neutral, binding arbitration and not by a court action. Any claim or dispute is to be arbitrated on an individual basis and not as a class action.* Whoever first demands arbitration may choose to proceed under the applicable rules of the American Arbitration Association. . . .

Whichever rules are chosen, the arbitrator shall be an attorney or retired judge. . . . If you demand arbitration first, you will pay the claimant's initial arbitration filing fees or case management fees required by the applicable rules up to $125, and we will pay any additional initial filing fee[s]. . . . The arbitrator shall decide who shall pay any additional costs and fees.

[Emphasis added.]

By signing the RIC, defendant accepted the retail contract and assigned it to a third party financing company, DaimlerChrysler Financial Services Americas, LLC.[3]

### The Addendum

The four-page Addendum amended the RIC to provide optional "gap" insurance. Such gap insurance is designed to cover the difference between what the vehicle is worth at the time of a total loss and what the buyer still may owe on the purchase. The Addendum contained several arbitration provisions, which stated in relevant part:

> *Any controversy or dispute* arising out of or relating in any way to this addendum ... including for recovery of any claim under the addendum including the applicability of this arbitration clause and the validity of this addendum *shall be resolved by neutral binding arbitration on an individual basis without resort to any form of class action* ....
>
> . . . .
>
> 2. The cost of the arbitration shall be borne by us except that each party must bear the cost of filing and the cost of its own attorneys, experts and witness fees and expenses. . . . If the arbitrator holds that a party has raised a dispute without substantial justification, the arbitrator shall have the authority to order that the cost of the arbitration proceedings be borne by the other party.
>
> 3. It is understood and agreed that the arbitration shall be binding upon the parties, that the parties are waiving their right to seek remedies in court, including the right to a jury [trial]. *You will not be able to participate as a representative or member of any class of claimants.* An arbitration award may not be set aside in later litigation except upon the limited circumstances set forth in the Federal Arbitration Act. . . .
>
> 4. *All statutes of limitations* that would otherwise be applicable *shall apply* to any arbitration proceedings.
>
> [Emphasis added.]

According to its text, the Addendum applied to "the customer/borrower ... and the dealer/creditor ... or if assigned[,] with the assignee." It included a signature line for the "dealer/creditor." [4]

---

[3] The financing company is not a party to this litigation.

[4] Although the signed copy of the Addendum in the record clearly reflects plaintiff's signature, the signature on behalf of the dealer/creditor is illegible, undated, and leaves blank that company representative's title.

The Addendum further included a provision indicating that it superseded "any prior agreement":

If any portion of this arbitration agreement provision is deemed invalid or unenforceable, the remaining portions of this arbitration provision shall neverthe-less remain valid and in force. *In the event of a conflict or inconsistency between this arbitration provision and the other provisions of this agreement or any prior agreement, this arbitration provision shall govern.*

[Emphasis added.]

This supersession provision did not define the term "any prior agreement."

*The SAD*

According to the SAD, which was signed by both plaintiff and a representative of the dealership,[5] plaintiff agreed to arbitrate "all claims and disputes between" the parties, which were to include:

Without limitation, all claims and disputes arising out of, in connection with, or relating to:

- [plaintiff's] purchase of any goods or services from [defendant];

- any previous purchase of goods or services from [defendant];

- all the documents relating to this or any previous purchase of goods or services from [defendant];

- any service contract or other after market products purchased in connection with this or any previous purchase;

- whether the claim or dispute must be arbitrated;

- the validity of this arbitration agreement;

- any negotiations between [plaintiff] and [defendant];

- any claim or dispute based on an allegation of fraud or misrepresentation, including fraud in the inducement of this or any other agreement;

- any claim or dispute based on a federal or state statute including, but not limited to the [Consumer Fraud Act] . . . and the Federal Truth in Lending Act;

- any claim or dispute based on an alleged tort; and

---

[5] As with the Addendum, the signature of the "seller" on the SAD is illegible.

- any claim or dispute based on breach of contract.

The SAD further stated that it applied to:

*[A]ny claim or dispute,* including all the kinds of disputes listed above, between you and any of our employees or agents, any of our affiliate corporations, and any of their employees or agents *and any third parties related to this transaction.* [Emphasis added.]

Under yet another section, entitled "OTHER IMPORTANT AGREEMENTS," the SAD provided:

1. *This [SAD] does not affect the applicability of any statute of limitations.*

2. *The Federal Arbitration Act applies to and governs this agreement.*

. . .

5. If any term of this agreement is unenforceable, the remaining terms of this agreement are *severable and enforceable to the fullest extent permitted by law.*

6. *This agreement supersedes any prior arbitration agreement that there may be between you and us.*

7. *This agreement is fully binding in the event a class action is filed in which you would be a class representative or member.* You and we agree that arbitrations pursuant to this agreement which involve you and us and/or us and any other person cannot be consolidated unless we consent to a consolidation. *You and we further agree that there shall be no class action arbitration pursuant to this agreement.*

. . . .

9. *If you have signed a[n RIC]* in connection with this transaction *which contains a different arbitration agreement, then this [SAD] shall supersede that arbitration agreement and this [SAD] shall control* any claims or disputes between you and us.

10. The arbitrator shall render his/her decision only in conformance with New Jersey law and evidence rules. If the arbitrator fails to render a decision in conformance with New Jersey law or evidence, then the award may be reversed by a court of competent jurisdiction for mere errors of New Jersey law. A mere error is the failure to follow New Jersey law.

11. Customer agrees that Customer will bring any claims Customer may have against Dealer, including claims under the [Consumer Fraud Act], *within 180 days from the date of this agreement and if not brought within 180 days all claims will be time barred.*

[Emphasis added.]

Immediately above the signature line of the SAD, in bold and capitalized print, it cautioned: **"READ THIS ARBITRATION AGREEMENT CAREFULLY. IT LIMITS CERTAIN OF YOUR RIGHTS, INCLUDING YOUR RIGHT TO MAINTAIN A COURT ACTION."**

*The Consumer Notice*

Plaintiff also signed a consumer notice, which provided, in capital letters, that:

CHERRY HILL TRIPLEX DOES NOT MAKE ANY ORAL AGREEMENTS. ALL AGREEMENTS WHICH YOU HAVE MADE ARE CONTAINED IN THE WRITTEN CONTRACT DOCUMENTS THAT YOU ARE BEING ASKED TO SIGN. IF YOU HAVE MADE AN AGREEMENT THAT IS NOT CONTAINED OR SPECIFIED IN THE WRITTEN DOCUMENTS—DO NOT SIGN THE DOCUMENTS!

BY SIGNING BELOW, YOU ACKNOWLEDGE THAT YOU HAVE READ ALL OF THE CONTRACT DOCUMENTS PRIOR TO SIGNING THEM AND THAT *THE CONTRACT DOCUMENTS WHICH YOU HAVE SIGNED CONTAIN ALL OF THE TERMS OF THE AGREEMENT BETWEEN YOU AND CHERRY HILL TRIPLEX.* YOU FURTHER ACKNOWLEDGE THAT THERE WERE NO ORAL AGREEMENTS!

I ACKNOWLEDGE BY SIGNING BELOW THAT I HAVE READ ALL OF THE DOCUMENTS I HAVE SIGNED PRIOR TO SIGNING THEM AND THAT ALL OF THE TERMS OF THE AGREEMENT BETWEEN MYSELF AND CHERRY HILL TRIPLEX ARE ACCURATELY REFLECTED IN THOSE DOCUMENTS. *I ALSO ACKNOWLEDGE THAT I UNDERSTOOD ALL DOCUMENTS I SIGNED* AND THAT I HAVE RECEIVED A COPY OF ALL DOCUMENTS WHICH I HAVE SIGNED.

[Emphasis added.]

*The MVROA*

The MVROA did not specifically discuss arbitration, but it provided the following:

**EXECUTION OF OTHER DOCUMENTS.** *The Customer,* before or at the time of delivery of the motor vehicle covered by this Order *will execute such other forms of agreement or documents as may be required* by the terms and conditions of payment in accordance with Customer's election to purchase . . . the vehicle covered by this Order.

[Emphasis added.]

In small print above the signature line, the MVROA also stated that:

Customer agrees that this Order on the face and on the reverse side and any attachments to it includes all the terms and conditions, if a cash sale. *Customer further agrees this Order cancels and supersedes any prior [MVROA] and* as of the date signed by Dealer or authorized agent, *comprises the complete and exclusive statement of the terms of the agreement between Customer and Dealer unless the purchase is a credit sale or lease.*

[Emphasis added.]

The MVROA did not define what constituted a "credit sale."

*The Waiver Document*

Plaintiff also signed a separate waiver document, which largely addressed topics unrelated to the issues on appeal, such as the buyer's liability for lease termination charges. We do note that this document attempted to insulate the dealership from liability for failing to honor promises that it may have made in its advertising. In particular, the waiver document recited that the purchaser shall:

[R]elinquish and waive any claims to any financial benefit represented in any and all of CHERRY HILL TRIPLEX promotions or advertisements in consideration for the personal and individual negotiations and agreements reached as part of my purchase....

*The Spot Delivery Agreement*

Finally, plaintiff signed a so-called "spot delivery" agreement, which permitted her to take possession of the vehicle "prior to financing being finalized." The document contained several provisions discussing her obligations in the event that financing was not approved.

*Post–Sale Events*

After signing these various documents, plaintiff took possession of her new Sportage and drove it home. The dealership, in turn, took possession of the trade-in Cavalier.

When plaintiff returned home, she realized that defendant had charged her $25,999 for the Sportage instead of the advertised MSRP of $19,575, a difference of $6,424. According to figures set forth in the RIC and the MVROA, defendant had subtracted plaintiff's $500 down payment, her $5,000 trade-in credit, and the $1,000 rebate, from a sale price of $25,999, rather than subtracting those sums from the advertised MSRP of $19,575. Defendant also charged plaintiff, purportedly unbeknownst to her, an additional $600 for gap insurance, an additional $1,500 for a service contract, and an additional $65.80 for vehicle registration fees. Taking into

account applicable sales taxes, these combined charges raised the total amount financed to $23,430.73. However, the RIC did reflect a monthly payment figure of $398.47, the same anticipated monthly charge that the salesperson had allegedly represented to plaintiff.

Plaintiff complained to the dealership about these various charges, but the parties were unable to resolve their dispute. Plaintiff alleges that she demanded that the dealership rescind the transaction, but it declined to do so, telling her that it no longer had the Cavalier that she had traded in.

*The Litigation*

In November 2007, plaintiff and the NAACP of Camden County East (collectively, "plaintiffs") filed a complaint against the dealership in the Law Division.[6] In April 2008, plaintiffs filed an amended complaint.

In their pleadings, plaintiffs alleged that defendant's sales practices violated several New Jersey statutes, including the Consumer Fraud Act ("CFA"), *N.J.S.A.* 56:8–1 to –18; the Plain Language Act ("PLA"), *N.J.S.A.* 56:12–1 to –13; the Truth–in–Consumer Contract, Warranty and Notice Act ("TCCWNA"), *N.J.S.A.* 56:12–14 to –18; and the Law Against Discrimination ("LAD"), *N.J.S.A.* 10:5–1 to –49. Among other things, plaintiffs claimed that the dealership "routinely engages in the practice of 'boosting' customers' contracts by the value of their trade-ins or rebates they receive and 'packing' customers['] contracts with unnecessary and unconscionably priced service contracts and gap policies." The amended complaint sought to bring these claims as a class action, designating three sub-classes, including "[a]ll African–Americans who have purchased or leased a vehicle from [defendant]." [7]

---

[6] The parties did not discuss in their briefs the original complaint, nor did they provide a copy of it in their appendices.

[7] The other two proposed sub-classes are: (1) "all persons who have signed form documents presented by [defendant], the preprinted portions of which were

Defendant acknowledged that it sold plaintiff a new car on the terms stated in the contract documents, but denied that it acted deceptively or violated any laws.

*Defendant's Motion to Dismiss*

Defendant filed a pre-answer motion to dismiss the amended complaint. Among other things, the dealership argued that the NAACP lacked standing and that the arbitration provisions within the contract documents barred plaintiff from litigating her claims in the Superior Court.

After the trial court heard oral argument, it first concluded that the NAACP did not have standing as a co-plaintiff in this matter. Consequently, on October 7, 2008, the court issued an order dismissing the amended complaint as to the NAACP, with prejudice.

At the same time, the trial court preliminarily detected a material dispute as to whether, given the projected monetary value of plaintiff's case, the class action waiver provisions in the contract documents would have an untenable chilling effect on the enforcement of consumer claims. If such a chilling effect were proven, the trial court perceived that the class action waiver might be invalidated on public policy grounds, as the New Jersey Supreme Court had found in *Muhammad v. County Bank of Rehoboth Beach*, 189 *N.J.* 1, 20–22, 912 *A.*2d 88 (2006), *cert. denied*, 549 *U.S.* 1338, 127 *S.Ct.* 2032, 167 *L.Ed.*2d 763 (2007).

Accordingly, the trial court provisionally denied defendant's motion to dismiss plaintiff's amended complaint. Relying on *Muhammad*, the court ordered a plenary hearing to assess whether plaintiff would be able to find a competent attorney to represent her in an arbitration on an individualized basis. Defendant

---

identical or substantially similar to the [contract documents signed by plaintiff]"; and (2) "all persons who have had the price of the vehicle they purchased from [defendant] fraudulently increased as a result of [defendant's] violation of [the CFA and related consumer regulations]."

filed a motion for reconsideration, which the original motion judge denied.[8]

*Plaintiff's Motion for Partial Summary Judgment*

In November 2008, plaintiff filed a motion for partial summary judgment, arguing that the arbitration provisions in the contract documents were unenforceable as a matter of law, and that she was entitled to proceed with her claims in the Superior Court. As part of her contentions, plaintiff urged the court to consider the dealership's alleged history of deceptive sales practices, which, according to plaintiff, had resulted in investigations of defendant by the New Jersey Attorney General in 2001 and 2009.

To this end, plaintiff submitted an expert report from an auto industry consultant, David A. Stivers. In his report, Stivers described the kinds of deceptive sales practices that he contended are typically used by dishonest car dealers. Among other things, Stivers stated:

> Based on my experience in investigating fraud in the automobile sales industry, *it is common for dishonest dealers to use multi-form documents to enable the dealer to have customers sign documents unfavorable to the consumer without their knowledge or awareness.* This permits the dealer *to camouflage provisions which are unfavorable to the consumer.*
>
> [Emphasis added.]

Stivers continued:

> *It would have been rather simple and easy for this dealer [defendant] to use a single document which contains a table of contents or alphabetical index that contains all the terms of the contract, including an arbitration clause,* which would have highlighted in conformance with the [PLA] the many exceptions to the main promise of this contract. The main terms are the price, monthly payment, interest-rate and term. *The contradictory language in the ... arbitration clauses could have been easily eliminated.*
>
> [Emphasis added.]

Defendant responded with a cross-motion to dismiss plaintiff's amended complaint and to compel arbitration.

---

[8] Following these initial rulings, the case was transferred to a different judge. The ensuing rulings in this case that we discuss were made by the successor judge.

After hearing oral argument on the parties' competing motions, the judge issued a bench ruling on March 9, 2009. The ruling denied plaintiff's motion for partial summary judgment and, subject to a *Muhammad* hearing, granted defendant's cross-motion.

The judge held that the arbitration provisions, subject to certain excisions, were presumptively enforceable. The judge found that plaintiff's allegations as to defendant's past misconduct were irrelevant to the determination of enforceability. However, the judge did find invalid, and accordingly severed, certain provisions in the contract documents. In particular, the judge nullified provisions that shortened the applicable statute of limitations and which made plaintiff potentially liable for the dealership's defense costs in arbitration. The judge reiterated the first judge's finding that a *Muhammad* hearing was needed to assess whether the class waiver would have an undue chilling effect on the enforcement of consumer claims against the dealership.

Consistent with these rulings, the trial court entered an order on April 23, 2009, denying plaintiff's motion for partial summary judgment, but retaining jurisdiction to conduct a *Muhammad* hearing on the enforceability of the class action waiver. Subject to the results of that hearing, the matter would be referred to binding arbitration.

*The Muhammad Hearing*

The court conducted a plenary hearing pursuant to *Muhammad* on July 24, 2009. Plaintiff and defendant each presented several witnesses. These witnesses addressed the viability of litigating plaintiff's claims against the dealership on an individualized basis, based on her projected damages of $8,500 (untrebled) for her CFA claim and the fees that she would have to pay to her counsel out of a recovery.

Plaintiff presented expert testimony from Gregory Shivers, Stephen DeNittis, and Michael Halbfish, all of whom are practicing attorneys with experience in litigating consumer fraud claims. According to each of these attorney experts, plaintiff would have

difficulty finding a lawyer to represent her in an arbitration against the dealership on an individualized basis. The experts cited various reasons for their shared pessimism, including such factors as the complexity of the dealership's contract documents and the restrictions typically imposed upon discovery in arbitration.

Defendant presented testimony from two experts at the *Muhammad* hearing, Mitchell Berman and Perry Pittenger, both of whom are attorneys with experience in defending car dealerships from consumer claims. Both of those experts recalled personally being involved in past cases where the damages sought by the consumer were less than $8,500.

Defendant also presented testimony from William Kopp, the general manager of the Cherry Hill Triplex since January 2001. Kopp was responsible for overseeing the dealership's daily operations and addressing consumer complaints that result in litigation. Kopp testified that he had been personally involved in fifteen to twenty consumer complaints since 2001, and that he had been involved in several arbitrations with dissatisfied customers, who were represented by counsel, where the damages claimed were less than $8,500.

Additionally, defendant submitted a certification from Carl Poplar,[9] a litigator who has handled numerous CFA cases. Poplar stated that he personally "would take a case [as plaintiff's counsel] where the actual damages were less than $8500.00 in either arbitration or court if the statute provided [for] attorney's fees and I felt that the case had potential, which the instant case does." Poplar added that if other attorneys "believe the case has merit [they] will not hesitate to take a case with less than $8500 in actual damages because statutes like [the CFA] provide for attorney's fees even if there is just One Dollar ($1.00) in damages."

---

[9] Poplar did not testify at the *Muhammad* hearing.

Assessing these proofs from the *Muhammad* hearing, the trial court ruled that the class action waiver provisions did not violate public policy and were thus enforceable. In particular, the court found that it was not likely that attorneys would be unwilling to represent consumers such as plaintiff in an arbitration on claims against a dealership, given the potential for fee-shifting if such claims were successful. Hence, the court ruled that plaintiff was barred from pursuing her claims in a class action lawsuit or, by implication, a class-based arbitration.

The court memorialized its decision in a final order dated September 28, 2009. Accordingly, the lawsuit was dismissed and the matter was referred to arbitration.[10]

*The Appeal*

This appeal ensued. Although they raise several points, plaintiffs fundamentally assert that the trial court erred in enforcing the binding arbitration provisions in the form documents. Plaintiffs also raise several subsidiary arguments, including: (1) the NAACP should not have been dismissed as a co-plaintiff for lack of standing; (2) the trial court erred in not taking into account the dealership's alleged prior misconduct; (3) the court should not have denied partial summary judgment to plaintiff on the PLA and TCCWNA claims; (4) the court erred in finding the LAD claim arbitrable; and (5) the court should have granted class certification.

Following oral argument before this court, the United States Supreme Court issued its decision in *AT&T Mobility, supra.* We invited, and have considered, supplemental letter briefs from the parties addressing the impact of *AT&T Mobility* on this case, particularly as to the class action waiver issues.

---

[10] We presume that no arbitration has taken place, pending the outcome of this appeal.

## II.

Section 2 of the Federal Arbitration Act ("FAA"), 9 *U.S.C.* § 2, which applies to the contract documents in this case, reflects both "a liberal federal policy favoring arbitration," *Moses H. Cone Memorial Hospital v. Mercury Construction Corporation,* 460 *U.S.* 1, 24, 103 *S.Ct.* 927, 941, 74 *L.Ed.*2d 765, 785 (1983), and "the fundamental principle that arbitration is a matter of contract." *Rent–A–Center, W., Inc. v. Jackson,* 561 *U.S.* ——, ——, 130 *S.Ct.* 2772, 2776, 177 *L.Ed.*2d 403, 410 (2010). The United States Supreme Court recently reaffirmed those key principles in *AT&T Mobility, supra,* 563 *U.S.* at ——, 131 *S.Ct.* at 1745, 179 *L.Ed.*2d at 751 (quoting these passages from *Moses H. Cone* and *Rent–A–Center* ).

Our state law has similarly recognized these basic tenets. In many contexts, arbitration may be advantageous over traditional litigation in the courts because it can be faster, cheaper, and less formal. *See, e.g., Fawzy v. Fawzy,* 199 *N.J.* 456, 472, 973 *A.*2d 347 (2009); *Marchak v. Claridge Commons, Inc.,* 134 *N.J.* 275, 281, 633 *A.*2d 531 (1993). As we reiterated earlier this year in *Frumer v. National Home Insurance Company,* 420 *N.J.Super.* 7, 13, 18 *A.*3d 225 (App.Div.2011), " 'New Jersey law comports with its federal counterpart in striving to enforce arbitration agreements.' " (quoting *Jansen v. Salomon Smith Barney, Inc.,* 342 *N.J.Super.* 254, 257, 776 *A.*2d 816 (App.Div.), *certif. denied,* 170 *N.J.* 205, 785 *A.*2d 434 (2001)). " 'An agreement relating to arbitration should thus be read liberally to find arbitrability if reasonably possible.' " *Ibid.; see also N.J.S.A.* 2A:23B–1 to –32 ("New Jersey Arbitration Act") (providing in *N.J.S.A.* 2A:23B–6 that an agreement to arbitrate is "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract").

That said, an agreement to arbitrate must be the product of mutual assent, as determined under customary principles of contract law. *See N.J.S.A.* 2A:23B–6; *Muhammad, supra,* 189

*N.J.* at 15, 912 *A.*2d 88. There must be, as our cases instruct, a "meeting of the minds." *See, e.g., Pinto v. Spectrum Chems. & Lab. Prods.,* 200 *N.J.* 580, 600, 985 *A.*2d 1239 (2010) (upholding the trial court's ruling that a settlement agreement was unenforceable "because the parties never had a meeting of the minds on the precise terms of the agreement"); *Morton v. 4 Orchard Land Trust,* 180 *N.J.* 118, 120, 849 *A.*2d 164 (2004) (declining to enforce a sale agreement where the contract was missing the "essential element" of "a meeting of the minds on the terms of the agreement"). Consequently, the clarity and internal consistency of a contract's arbitration provisions are important factors in determining whether a party reasonably understood those provisions and agreed to be bound by them.

By its very nature, an agreement to arbitrate involves a waiver of a party's right to have her claims and defenses litigated in court. "Generally, we determine a written agreement's validity by considering the intentions of the parties as reflected in the four corners of the written instrument." *Leodori v. CIGNA Corp.,* 175 *N.J.* 293, 302, 814 *A.*2d 1098, *cert. denied,* 540 *U.S.* 938, 124 *S.Ct.* 74, 157 *L.Ed.*2d 250 (2003). Thus, such a waiver contained in a written provision "must reflect that [a party] has agreed clearly and unambiguously to arbitrate the disputed claim." *Ibid.*

Moreover, because arbitration provisions are often embedded in contracts of adhesion, courts take particular care in assuring the knowing assent of both parties to arbitrate, and a clear mutual understanding of the ramifications of that assent. *See, e.g., Fawzy, supra,* 199 *N.J.* at 469–70, 973 *A.*2d 347; *Marchak, supra,* 134 *N.J.* at 282, 633 *A.*2d 531. "This requirement of a 'consensual understanding' about the rights of access to the courts that are waived in the agreement has led our courts to hold that clarity is required." *Moore v. Woman to Woman Obstetrics & Gynecology, L.L.C.,* 416 *N.J.Super.* 30, 37, 3 *A.*3d 535 (App.Div. 2010) (quoting *Fawzy, supra,* 199 *N.J.* at 469–70, 973 *A.*2d 347).

Earlier this year, the United States Supreme Court in *AT&T Mobility* confirmed the applicability of these basic principles of

contract formation to arbitration provisions. The Court was presented in that case with arbitration provisions set forth in form contracts between a cellular telephone company and consumers who had purchased cell phones from that company. The contract terms provided for mandatory arbitration of all disputes between the parties. *AT&T Mobility, supra,* 563 *U.S.* at ——, 131 *S.Ct.* at 1744, 179 *L.Ed.*2d at 749. In addition, the contract "required that claims be brought in the parties' 'individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.'" *Ibid.* (citation to the record omitted). That provision further specified that "'the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.'" *Id.* at —— n. 2, 131 *S.Ct.* at 1744 n. 2, 179 *L.Ed.*2d at 749 n. 2 (citation to the record omitted).

After a dispute arose over the cellular contracts, the consumers filed a class action against the company in the federal district court. The company then moved to compel arbitration under the contract, which the consumers opposed. The company further argued that the consumers had waived their right to proceed on a class-wide basis, either in court or in arbitration. The United States Court of Appeals for the Ninth Circuit declared the class waiver provision unenforceable on public policy grounds, applying principles of California state contract law. *Id.* at ——, 131 *S.Ct.* at 1745, 179 *L.Ed.*2d at 750.

The Supreme Court reversed the Ninth Circuit's ruling in *AT&T Mobility,* holding that the FAA preempted the state's ability to nullify a class action waiver provision in an arbitration agreement on public policy grounds. *Id.* at ——, 131 *S.Ct.* at 1746–53, 179 *L.Ed.*2d at 752–59. The majority of the justices rejected the consumers' argument that because the monetary stakes that could arise in disputes under the contract were small, state law could invalidate the class action waiver as unconscionable. *Id.* at ——, 131 *S.Ct.* at 1753, 179 *L.Ed.*2d at 758. The majority instead held that the national policies favoring arbitra-

tion, as expressed in the FAA, precluded states from requiring "a [formal judicial] procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." *Ibid.*

The majority in *AT&T Mobility* specifically found that several aspects of class-based dispute resolution, such as greater formality, slower and more costly processes, and increased risks to defendants if the outcome is unfavorable to them, were incompatible with the basic characteristics of arbitration. *Id.* at ——, 131 *S.Ct.* at 1751–53, 179 *L.Ed.*2d at 756–59. Consequently, the Court held that California law could not invalidate the class action waiver in the cell phone contracts on public policy or unconscionability grounds. *Ibid.*[11]

Nevertheless, the Court in *AT&T Mobility* acknowledged that the FAA does not require an arbitration provision to be enforced if the provision is defective for reasons other than public policy or unconscionability. Other contract principles under state law, such as those governing the formation and interpretation of an agreement, may still pertain, subject to the overarching objectives of the FAA. As the majority noted in footnote six:

Of course States remain free to take steps addressing the concerns that attend contracts of adhesion—*for example, requiring class-action-waiver provisions in adhesive arbitration agreements to be highlighted.* Such steps cannot, however, conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms.

[*Id.* at —— n. 6, 131 *S.Ct.* at 1750 n. 6, 179 *L.Ed.*2d at 756 n. 6 (emphasis added).]

This caveat was developed more explicitly in Justice Thomas's concurring opinion, which represented the pivotal fifth vote in the Court's five-to-four decision in *AT&T Mobility.* As Justice Thomas noted, "the FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the *formation* of the arbitration agreement, such as by proving fraud or duress." *Id.* at ——, 131 *S.Ct.* at 1753, 179 *L.Ed.*2d at 759 (Thomas, J., concurring) (emphasis added) (citation omitted). On the other

---

[11] We discuss the discrete implications of this holding with respect to the class action waiver in defendant's contract provisions, in Part II(C), *infra.*

hand, "[c]ontract defenses unrelated to *the making* of the agreement—such as public policy—could not be the basis for declining to enforce an arbitration clause." *Id.* at ——, 131 *S.Ct.* at 1755, 179 *L.Ed.*2d at 761 (Thomas, J., concurring) (emphasis added). Justice Thomas further observed that "[c]ontract formation is based on *the consent of the parties,* and we have emphasized that '[a]rbitration under the [FAA] is a matter of consent.'" *Id.* at —— n. *, 131 *S.Ct.* at 1755 n. *, 179 *L.Ed.*2d at 761 n. * (Thomas, J., concurring) (emphasis added) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 *U.S.* 468, 479, 109 *S.Ct.* 1248, 1256, 103 *L.Ed.*2d 488, 500 (1989)).

Thus, in the aftermath of *AT&T Mobility,* state courts remain free to decline to enforce an arbitration provision by invoking traditional legal doctrines governing the formation of a contract and its interpretation. Applying such core principles of contract law here, we must decide whether there was mutual assent to the arbitration provisions in the dealership's contract documents. As part of that assessment, we must examine whether the terms of the provisions were stated with sufficient clarity and consistency to be reasonably understood by the consumer who is being charged with waiving her right to litigate a dispute in court.

We previously applied such fundamental requirements of clarity and consistency to the form contracts used by a car dealership, one affiliated with defendant in the present appeal, in *Rockel v. Cherry Hill Dodge,* 368 *N.J.Super.* 577, 847 *A.2d* 621 (App.Div.), *certif. denied,* 181 *N.J.* 545, 859 *A.2d* 689 (2004). Similar to the circumstances here, *Rockel* involved conflicting arbitration provisions set forth in multiple contract documents, namely, an RIC and an MVROA. *Id.* at 581, 847 *A.2d* 621. Although the RIC in this matter is apparently the same as or similar to the one used in *Rockel,* there was no separate arbitration agreement in *Rockel. Id.* at 581–82, 847 *A.2d* 621. Instead, the MVROA in *Rockel* incorporated a clause that provided:

ARBITRATION: The terms of this Agreement are hereby incorporated herein and made a part of this Agreement. Dealer and you, the purchaser, agree that any controversy or claim arising out of or relating to this Agreement *shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA")*.

[*Id.* at 581, 847 *A*.2d 621.]

Comparing the arbitration provisions in the two documents, the panel in *Rockel* found that the RIC's arbitration clause was broader than the MVROA's. That was so because the RIC "purport[ed] to render arbitrable the scope and meaning of the arbitration agreement, attempt[ed] to extend the arbitration agreement to persons not parties to the agreement, and declare[d] that the right to elect arbitration may be exercised even by non-parties." *Id.* at 582–83, 847 *A*.2d 621.

We concluded in *Rockel* that the arbitration provisions there were unenforceable, largely relying upon basic tenets of contract formation and interpretation. *Ibid.* Among other things, we highlighted the "uncertain content of the parties' agreement to arbitrate"; the "contracts' conflicting descriptions of the manner and procedure which would govern the arbitration proceedings"; the "absence of a definitive waiver of plaintiff's statutory claims"; and the "obscure appearance and location of the arbitration provisions" within the agreements. *Id.* at 580, 847 *A*.2d 621. Viewed in combination, these flaws "militate[d] against the entry of an order requiring arbitration[.]" *Ibid.*

In reaching our conclusion in *Rockel,* we compared the arbitration provisions in that case to other cases involving the arbitration of statutory claims. *Id.* at 580–81, 847 *A*.2d 621. In particular, we considered *Gras v. Associates First Capital Corporation,* 346 *N.J.Super.* 42, 786 *A*.2d 886 (App.Div.2001), *certif. denied,* 171 *N.J.* 445, 794 *A*.2d 184 (2002), a case in which we upheld arbitration provisions contained within a series of bank loan documents and rejected the plaintiffs' argument that the arbitration provisions in the loan documents were too obscure or unclear to enforce. *Id.* at 46–47, 57, 786 *A*.2d 886. We specifically distin-

guished the contract provisions in *Gras* from the defective provisions in the dealership's agreements in *Rockel:*

> In *Gras,* we held that an arbitration provision was "specific enough to inform plaintiffs that they were waiving their statutory rights to litigation in a court," and concluded that the policy in favor of the arbitration of disputes sufficiently outweighed the plaintiffs' statutory right to present their claims to a jury in a court of law. *Here, the arbitration agreement is highly ambiguous because the parties executed two documents which contain separate and somewhat disparate arbitration clauses.* This ambiguity, we conclude, is fatal to the compelling of the arbitration of plaintiffs' CFA claims.
>
> [*Rockel, supra,* 368 *N.J.Super.* at 581, 847 *A.2d* 621 (emphasis added) (citation omitted).]

Following *Rockel,* the dealership apparently revised the arbitration provisions within its form contracts, leading to the provisions that are at issue in the present litigation.

## A.

We now proceed to apply these basic principles of contract formation to the multiple arbitration provisions in this case. As we have noted, the provisions are spread across three different documents, namely, the RIC, the SAD, and the Addendum. The trial court concluded that these provisions, read as a whole, were sufficiently clear and could be sufficiently harmonized to reflect mutual assent and thus were enforceable.

We review the trial court's legal assessment *de novo,* and we do not accord any special deference to the court's conclusions. The "interpretation of an arbitration clause is a matter of contractual construction that this court should address de novo." *Coast Auto. Grp., Ltd. v. Withum Smith & Brown,* 413 *N.J.Super.* 363, 369, 995 *A.2d* 300 (App.Div.2010); *see also EPIX Holdings Corp. v. Marsh & McLennan Cos.,* 410 *N.J.Super.* 453, 472, 982 *A.2d* 1194 (App.Div.2009) (noting that "[o]ur standard of review of the applicability and scope of an arbitration agreement is plenary"). We further note that such *de novo* review is especially appropriate in evaluating a trial court's ruling on summary judgment. *See Prudential Prop. & Cas. Ins. Co. v. Boylan,* 307 *N.J.Super.* 162,

167, 704 *A.*2d 597 (App.Div), *certif. denied,* 154 *N.J.* 608, 713 *A.*2d 499 (1998).

Viewed in their totality, the arbitration provisions scattered among the RIC, the Addendum, and the SAD are too plagued with confusing terms and inconsistencies to put a reasonable consumer on fair notice of their intended meaning. We recognize that an especially prudent purchaser who takes the time to read these documents, which are laden with fine print, would likely obtain a generalized sense that a post-sale dispute would be handled through some kind of arbitration. Even so, the assorted documents do not plainly convey—with precision and consistency—what the exact terms and conditions of that arbitration process would be. Consequently, the form documents in this case suffer from the same, if not the identical, kinds of deficiencies that infected the arbitration provisions in *Rockel.*

To begin with, the documents do not clearly and consistently express the nature and locale of the arbitration forum itself. The RIC allows the arbitration to be conducted under either the rules of the American Arbitration Association ("AAA") or the National Arbitration Forum ("NAF"), whereas the SAD and the Addendum restrict the arbitration to only AAA rules. The RIC further states that "[w]hichever rules are chosen, the arbitrator shall be an attorney or retired judge," but the SAD and the Addendum provide that the arbitrator is to be selected in accordance with AAA commercial arbitration rules, which do not require arbitrators to be attorneys.[12] Moreover, the venue of the arbitration under the RIC is the "federal district" in which the purchaser resides, while the Addendum more narrowly states that the venue will be the customer's "county of residence," and the SAD more broadly states that the arbitration "will take place in the State of New Jersey" unless the parties agree on a different location.

[12] *See* American Arbitration Association, *Commercial Arbitration Rules & Mediation Procedures* 21 § R–3 (2010), http://www.adr.org/si.asp?id=6447 (establishing the National Roster of Arbitrators and omitting any such qualification).

The form documents also do not make clear the time limit in which arbitration must be initiated. The RIC does not mention a time limitation. The Addendum states only that "[a]ll statutes of limitations that would otherwise be applicable shall apply." The SAD, meanwhile, contains inconsistent provisions respecting time limits. In paragraph one of its section headed "OTHER IMPORTANT AGREEMENTS," the SAD recites that "[t]his agreement does *not*[13] affect the applicability of any statute of limitations." (Emphasis added). However, in paragraph eleven of that same section, the SAD more restrictively requires the purchaser to bring any claims, "including claims under the New Jersey Consumer Fraud Act, within 180 days from the date of this [SAD] agreement and if not brought within 180 days all claims will be time barred."

As the trial court correctly recognized, this latter provision in paragraph eleven of the SAD is at odds with the six-year statute of limitations generally applicable to CFA claims arising out of the sale of merchandise. *See N.J.S.A.* 2A:14–1; *D'Angelo v. Miller Yacht Sales,* 261 *N.J.Super.* 683, 688, 619 *A.*2d 689 (App.Div.1993). For this reason, the trial court declined to enforce this shorter limitations period, and severed it from the parties' contract.

Equally murky and conflicting are the assorted provisions describing the costs of the arbitration and who is to bear them. The RIC states that if the purchaser demands arbitration first, she "will pay the claimant's initial arbitration filing fees or case management fees required by the applicable rules up to $125," and the dealership "will pay any additional initial filing fee or case management fee." The RIC further states that the dealership will pay "the whole filing fee or case management fee" if it demands arbitration first. The dealership also promises under the RIC to "pay the arbitration costs and fees for the first day of arbitration, up to a maximum of eight hours" and "[t]he arbitrator shall decide

---

[13] At oral argument before the trial court, defense counsel suggested that the term "not" was mistakenly included in the SAD as a typographical error.

who shall pay any additional costs and fees." The RIC permits the purchaser to request the dealership to waive the purchaser's fees or have the dealership pay a higher share of them, depending upon the purchaser's "financial circumstances" or the "nature of [her] claim."

The cost provisions in the SAD are in some respects potentially less favorable to the purchaser than those in the RIC, in some respects potentially more favorable, and in some respects unclear. The SAD states that if the purchaser requests arbitration, she "agree[s] to pay the initial filing fee and required deposit required by the [AAA]," and, conversely, if the dealership starts the arbitration, it will "pay the filing fee and required deposit." There is no $125 cap on the purchaser's share of the filing fees, as there is in the RIC. Unlike the RIC, the SAD does not commit the dealership to pay the costs of the first day or eight hours of the arbitration. In fact, the SAD is silent as to who bears those particular costs.

The SAD further states that if a party refuses to dismiss a lawsuit or other action and submit to arbitration, that party, if its refusal is not justified, "shall pay all reasonable attorney's fees and costs incurred by the other party in seeking a dismissal" of the other proceeding. No comparable provision appears in the RIC.

Meanwhile, the Addendum prescribes a third cost-allocation arrangement. It states that "the cost of the arbitration shall be borne by us [the dealer/creditor] except that each party must bear the cost of filing and the cost of its own attorneys, experts and witness fees and expenses." In addition, the Addendum states that the purchaser may seek a waiver of the filing fee, under the standards set forth in "the applicable AAA rules," which are not described.

In yet another variation, the Addendum includes a merits-based fee shifting mechanism, providing that "[i]f the arbitrator holds that a party has raised a dispute without substantial justification, the arbitrator shall have the authority to order that the cost of the

arbitration proceedings be borne by the other party." The term "cost" in that provision is not defined, leaving it uncertain whether it covers filing fees, expert fees, attorney's fees, the arbitrator's fees, or all or only some of those charges.[14]

Further adding to the confusion, the Addendum and the SAD both contain provisions stating that each would take precedence over any other agreements in the event of a dispute. It is therefore unclear whether the SAD would have primacy over the Addendum (and the RIC that the Addendum modifies), or vice-versa.

The class waiver provisions in the contract documents are similarly confounding. While the RIC is fairly straightforward on this subject, as it prohibits the purchaser from taking part in either "a class-action lawsuit or class arbitration," the SAD blurs this prohibition with vague and internally-inconsistent language.

Paragraph seven of the SAD begins with the sentence: "This agreement is fully binding in the event a class action is filed in which you would be a class representative or member." That first sentence suggests, at least at first blush, that a purchaser may authorize her name to be included as a named representative plaintiff in a class action lawsuit, but that such participation would be subject to the "fully binding" terms of the SAD. There is no explanation to the purchaser within this paragraph that other terms of the SAD would preclude her from bringing *any* lawsuit against the dealership, let alone a class action.

The potential for confusion is still further compounded by the third and final sentence of paragraph seven of the SAD, which recites: "You and we further agree that there shall be *no class action arbitration* pursuant to this agreement." (Emphasis added). By restricting its reference to a class action "arbitration," this

---

[14] As we have already mentioned, the trial court declared the fee-shifting provisions invalid and severed them, although the court did not clarify or reconcile the other vague and conflicting aspects of the cost provisions appearing in the three instruments.

third sentence could easily lead a purchaser to believe that she would be free to take part in a class action *lawsuit*, either as a named representative or simply as a class member.

The Addendum, meanwhile, worsens the confusion. The Addendum declares that:

[I]t is understood and agreed that the arbitration shall be binding upon the parties, that the parties are waiving their right to seek remedies *in court*, including a right to a jury trail [sic]. You will *not be able to participate as a representative or member of any class of claimants*.

[Emphasis added.]

Because this language in the Addendum is solely directed at proceedings "in court," it leaves uncertain whether a consumer could participate in a class arbitration, which would be outside of "court."

The class waiver provisions in the three key documents are thus collectively riddled with vague and inconsistent provisions. A purchaser easily could find it difficult to harmonize and understand such dissonant terms.

### B.

Defendant argues that these problems in the wording of the arbitration provisions are inconsequential for several reasons, none of which we accept.

First, defendant contends that there was no actual conflict in the purchase documents because the dealership was only a party to the SAD and not a party to the RIC or the Addendum. This contention overlooks the fact that there is a signature line for the "[D]ealer or its Authorized Representative" on the RIC, and an ambiguous signature line for the "Dealer/Creditor" on the Addendum. In fact, a dealership representative apparently did sign the RIC and the Addendum, albeit illegibly.

Moreover, although we recognize that, at this juncture, neither defendant nor the financing company has sought to enforce the RIC or the Addendum in this case, that does not foreclose the possibility that such a dispute might arise in the future, either

with plaintiff or another purchaser. Although the financing company's relationship with the purchaser may be the primary focus of the RIC and the Addendum, we simply cannot ignore the conflicting aspects of these documents, considering that "in certain situations, a non-signatory to an arbitration agreement may compel a signatory to arbitrate." *EPIX, supra,* 410 *N.J.Super.* at 463, 982 *A.*2d 1194.

Second, defendant maintains that it is not possible to draft a less confusing arbitration agreement because of the complexity of car sale transactions and the frequent involvement of third-party financing companies in such sales. However, Stivers's expert report disputed this contention. Even if defendant is correct that multiple documents are needed for financed vehicle purchases, the allegedly inherent complexity of the overall transaction only enhances the need for clarity in the contract documents. It is particularly vital that provisions relating to the purchaser's waiver of her right to sue and her consent to submit to binding arbitration be explained to her in clear and consistent terms. If, as a practical matter, the dealership lacks control over the phrasing of arbitration provisions that may be required by financing companies, then, at the very least, it should not create its own separate agreement that provides the purchaser with even fewer rights, as defendant, in some respects, attempted to do here through the SAD.

Defendant further argues that the supersession clause in the SAD ameliorates the conflicts between the SAD and the RIC and the Addendum. Although the trial court agreed with this contention, we do not. For one thing, as we have already noted, the Addendum itself (which modifies the RIC) has its own supersession clause, leaving uncertain whether the SAD or the Addendum is the controlling document. Moreover, the SAD itself has several critical ambiguities of its own, particularly with respect to the allocation of arbitration costs and the waiver of the right to bring class action lawsuits.

It is unreasonable to expect a layperson to pore through the many arbitration provisions scattered within these multiple documents and discern which provisions are operative and exactly what they mean. Material deficiencies in contract documents cannot be masked, to a consumer's disadvantage, with a boilerplate supersession clause.

The trial court favorably likened the contract documents in this case to the arbitration terms within the bank loan agreements in *Gras, supra,* which we enforced. In our view, the facts in *Gras* are not sufficiently similar to validate the contract provisions in this case. Although each loan in *Gras* was accompanied by a separate arbitration agreement, the terms of arbitration were apparently expressed the same way in each such agreement. *Gras, supra,* 346 *N.J.Super.* at 46, 786 *A.2d* 886. Our opinion in *Gras* does not identify any inconsistencies or ambiguities in those common terms. *Id.* at 46–57, 786 *A.2d* 886. By contrast, this case involves multiple, conflicting, and unclear arbitration clauses spanning three different documents. The confusing and inconsistent provisions in this case are more akin to the dealership forms we invalidated in *Rockel.* Although the documents before us in some respects may be less confounding than those in *Rockel,* they are still too confusing and too unclear to be imposed upon a consumer.

■ Neither do we find that the ambiguities created by the contract documents can be cured by simply severing one or more provisions or clauses. Severability is only an option if striking the unenforceable portions of an agreement leaves behind a clear residue that is manifestly consistent with the "central purpose" of the contracting parties, and that is capable of enforcement. *See Jacob v. Norris, McLaughlin & Marcus,* 128 *N.J.* 10, 33, 607 *A.2d* 142 (1992).

■ Here, the conflicting and ambiguous aspects of material parts of the arbitration provisions—i.e., those relative to venue, arbitrators' credentials, time limitations, costs, and class waivers— cannot be excised without severely gutting those provisions and

leaving uncertainty in their wake.[15]   Instead, we sever the arbitra-
tion provisions in their entirety, as neither party has argued that
the "central purpose" of plaintiff's vehicle purchase hinged upon
the presence or absence of an arbitration agreement.   *Ibid.*

In sum, the cumulative effect of the many inconsistencies and
unclear passages in the arbitration terms within the RIC, the
Addendum, and the SAD compel us to declare them unenforceable
for lack of mutual assent.   We therefore reverse the trial court's
contrary legal conclusion of enforceability, and sever the arbitra-
tion provisions from the parties' agreement as a whole.

C.

Nevertheless, one discrete aspect of the trial court's decision
must be upheld, albeit for a different reason than the court
expressed.   Specifically, the court rejected plaintiffs' claim that
the class action waiver provisions here were unconscionable and
unenforceable on public policy grounds.   The court reached that
conclusion on an evidential basis, after considering the testimony
from the *Muhammad* hearing.   Today, in light of the United
States Supreme Court's supervening opinion in *AT&T Mobility*,
plaintiffs' unconscionability and public policy arguments must fail
for a legal reason, regardless of how one views the testimony
adduced at the *Muhammad* hearing.

As we have noted, the Court in *AT&T Mobility* held that
the FAA preempts courts from nullifying class action waiver
provisions in arbitration agreements based upon state-law notions
of unconscionability or public policy.   *AT&T Mobility, supra,* 563
*U.S.* at ——, 131 *S.Ct.* at 1753, 179 *L.Ed.*2d at 758–59.   The Court

---

[15] We also are unpersuaded by defendant's argument that we should uphold
the arbitration provisions based upon the reasoning of an unpublished decision
of the federal district court, an opinion that is not binding on plaintiffs or upon
this court.   *See R.* 1:36-3.   We further note that the Addendum was apparently
not before the district court in that unpublished case.   Similarly, we are not
bound by, and will not discuss, the orders copied in the appendices, which are
from two other Law Division cases that enforced defendant's arbitration provi-
sions.   *Ibid.*

unambiguously ruled that the FAA trumps state law in this respect. *Ibid.* Consequently, we must reject plaintiffs' specific attempt to have us declare the class action waiver provisions in this case invalid on the basis that such waivers, as a policy matter, unconscionably discourage the pursuit of "low-value" claims such as those involved here. *See ibid.*

In their supplemental brief, plaintiffs argue that the Supreme Court's analysis of the class waiver provisions in *AT&T Mobility* has no bearing on this case. They variously contend that: (1) this case does not involve interstate commerce, making the FAA inapplicable; (2) *AT&T Mobility* does not apply to their allegations of class-wide fraud; (3) the defendant company's arbitration provisions in *AT&T Mobility* were more favorable to consumers than those used by the dealership here; and (4) *AT&T Mobility* condemns only generalized state-law nullifications of class waivers, not case-specific ones.

None of plaintiffs' arguments attempting to distinguish *AT&T Mobility* are convincing. The retail sale of automobiles is clearly a form of interstate commerce covered by the FAA. *See Citizens Bank v. Alafabco, Inc.,* 539 *U.S.* 52, 56, 123 *S.Ct.* 2037, 2040, 156 *L.Ed.*2d 46, 51 (2003) (broadly applying the FAA to transactions " 'in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice ... subject to federal control' "); *see also Estate of Ruszala v. Brookdale Living Cmtys., Inc.,* 415 *N.J.Super.* 272, 288–92, 1 *A.*3d 806 (App.Div.2010) (finding that the operation of nursing homes in New Jersey involved sufficient interstate commerce to be subject to the FAA). For that matter, the parties here explicitly acknowledged in the SAD that the FAA "applies to and governs this agreement."

Plaintiffs' substantive allegations of fraud do not place this case beyond the preemptive scope of the FAA. In fact, the plaintiffs' claims in *AT&T Mobility* included allegations that the defendant there had engaged in false advertising and fraud by

charging sales tax on phones that it advertised for free. *AT&T Mobility, supra,* 563 *U.S.* at ——, 131 *S.Ct.* at 1744, 179 *L.Ed.*2d at 750.[16] The Court specifically rejected the plaintiffs' argument that no preemption under the FAA should apply because California law required, among other things, that "the consumer allege a scheme [by the defendant] to cheat consumers." *Id.* at ——, 131 *S.Ct.* at 1750, 179 *L.Ed.*2d at 755. The Court found that particular requirement inadequate to permit the state to nullify an arbitration agreement because it "has no limiting effect, as all that is required is an allegation [of fraud]." *Id.* at ——, 131 *S.Ct.* at 1750, 179 *L.Ed.*2d at 756.

The fact that the arbitration provisions in *AT&T Mobility* may have been more generous to consumers than the provisions here does not affect the force of the Supreme Court's preemption analysis. The Court's analysis turned on general doctrinal principles rather than the specific wording of the cellular contracts. *Id.* at ——, 131 *S.Ct.* at 1748–53, 179 *L.Ed.*2d at 754–59.

Lastly, the policy arguments advanced here by plaintiffs at the *Muhammad* hearing, in an effort to strike down the class waiver, were not conceptually restricted to this transaction. Rather, plaintiffs maintained that the class waiver was categorically unenforceable as to *any* purchaser from the dealership with claims of comparable worth, because the small monetary value of such individual claims would be generally unattractive to attorneys. A comparable "small-dollar" argument was expressly rejected by the Court in *AT&T Mobility. See id.* at ——, 131 *S.Ct.* at 1753, 179 *L.Ed.*2d at 758.[17]

---

[16] We distinguish such substantive claims of fraud concerning the transaction itself from an allegation that a consumer was fraudulently induced to agree to a class action waiver. The latter sort of fraud claim is one related to contract formation, a claim permitted under *AT&T Mobility. See AT&T Mobility, supra,* 563 *U.S.* at ——, 131 *S.Ct.* at 1744, 179 *L.Ed.*2d at 750. Nothing in this opinion should be read to suggest that defendant could impose a class waiver on a future customer in a fraudulent or deceptive manner.

[17] Even if *AT&T Mobility* could somehow be read to allow class waivers to be nullified under state law if the consumer claims are too small to litigate or

Applying, as we must, the governing precedent of *AT&T Mobility* to this record, we sustain the trial court's conclusion that the dealership's class action waiver was not *per se* invalid.[18] However, that discrete ruling still does not make the waiver provisions, as they were drafted here, enforceable. As we have already shown, the provisions before us are simply too convoluted and inconsistent to be enforced.

## III.

We next consider the trial court's determination that the NAACP lacked standing as a co-plaintiff. We vacate that determination, made by the judge who handled this case in only its initial stages, because it was premature.

"In order to possess standing, the plaintiff must have a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and there must be a substantial likelihood that the plaintiff will suffer harm in the event of an unfavorable decision." *N.J. Citizen Action v. Riviera Motel Corp.*, 296 *N.J.Super.* 402, 409–10, 686 *A.2d* 1265 (App.Div.1997), *appeal dismissed as moot*, 152 *N.J.* 361, 704 *A.2d* 1297 (1998). New Jersey courts have traditionally applied broader notions of standing than those applied in the federal courts. *See People for Open Gov't v. Roberts*, 397 *N.J.Super.* 502, 509, 938 *A.2d* 158

---

arbitrate individually, the trial court's findings of fact based upon the proofs at the *Muhammad* hearing rejected plaintiffs' contentions as to the alleged impediments in obtaining counsel. We must give deference to the trial court's factual findings, which were supported by substantial credible evidence from the hearing. *See Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 483–84, 323 *A.2d* 495 (1974).

[18] We do not address the continued precedential force of *Muhammad, supra*, in the wake of *AT&T Mobility*, and leave that assessment to the New Jersey Supreme Court. In addition, our disposition, striking down the specific arbitration provisions before us on the grounds of non-assent, makes it unnecessary to discuss plaintiffs' argument that the trial court should have taken into account this dealership's past negative history in assessing whether the class waiver provisions were enforceable.

(App.Div.2008). "In public interest and group litigation, especially, standing has been approached permissively." *In re Six Month Extension of N.J.A.C. 5:91–1,* 372 *N.J.Super.* 61, 86, 855 *A.*2d 582 (App.Div.2004), *certif. denied,* 182 *N.J.* 630, 868 *A.*2d 1032 (2005).

The amended complaint in this case asserted that the NAACP had an interest in preventing discrimination against African–Americans, an interest distinct from plaintiff Geraldine Thomas's own personal interests. Indeed, a focal point of the NAACP's desire to participate in this case is the claim that defendant's alleged sales practices are discriminatory under the LAD.

The Legislature enacted the LAD upon finding that the elimination of discrimination based on certain characteristics, such as race and color, is a significant matter of public concern. *See N.J.S.A.* 10:5–3. The LAD consequently makes it unlawful for "any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof" on the basis of that person's protected characteristics. *Id.* at –12(f). A "person," for the purposes of the LAD, is defined to include "one or more individuals, partnerships, *associations, organizations,* labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries." *Id.* at –5(a) (emphasis added). A "place of public accommodation," meanwhile, includes "any producer, manufacturer, wholesaler, *distributor, retail shop,* store, establishment, or concession dealing with *goods* or services of any kind...." *Id.* at –5(*l*) (emphasis added). The LAD expressly permits an aggrieved "person," which presumably includes an association or an organization such as the NAACP, to bring suit in the Superior Court against a "place of public accommodation," such as a car dealership. *Id.* at –13.

In assessing defendant's pre-answer motion to dismiss the NAACP because of a failure to assert a viable claim as to which that co-plaintiff had standing, the trial court was required to view the complaint indulgently and to accord plaintiffs every reasonable inference. At such an early stage of a case, the court's

inquiry must be limited to the adequacy of the pleadings, not plaintiffs' ultimate ability to prove their allegations. *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 746, 563 A.2d 31 (1989). "[T]he test for determining the adequacy of a pleading [is] whether a cause of action is 'suggested' by the facts." *Ibid.*

If, as plaintiffs have alleged, defendant targeted its supposedly unfair business practices at African–Americans, this case surely would implicate the NAACP's organizational interests in combating racial discrimination. *See S. Burlington Cnty. N.A.A.C.P. v. Mt. Laurel*, 92 *N.J.* 158, 337, 456 A.2d 390 (1983) (adopting an expansive approach to standing in *Mount Laurel* zoning and fair housing matters, noting that our courts "have never allowed 'procedural frustration' to prevent determinations on the merits where the plaintiff can demonstrate a legitimate interest in the lawsuit" (internal citation omitted)); *N.J. Citizen Action, supra,* 296 *N.J.Super.* at 416, 686 A.2d 1265 (holding that the plaintiff association had standing to bring a claim under the Americans with Disabilities Act on behalf of its disabled members, because the association had an interest in ensuring that the defendant complied with the statute's accessibility requirements).

The trial court acted too quickly in concluding that the NAACP lacked standing, and in dismissing it as a co-plaintiff. To be sure, the court correctly perceived that the mere fact that the individual plaintiff, Thomas, is African–American and a member of the NAACP does not automatically transform her dispute with the dealership into a case of racial discrimination warranting the NAACP's status as a co-party. The problem is that the trial court essentially presumed, in advance of discovery, that plaintiffs would not be able to develop proofs showing that the dealership's unfair practices are, as the amended complaint alleged, targeted against customers who are African–American. The truth of that allegation, and the ultimate merits of plaintiffs' LAD claims, must await the development of a plenary factual record.

We recognize that defendant vigorously disputes that it engages in any form of discrimination and that the contract documents it uses are the same for all purchasers, regardless of their race. Even so, the trial court was obligated, in the context of a pre-answer motion to dismiss the NAACP's claims, to accept at face value the allegations of discriminatory conduct, as pleaded in the amended complaint. *See Printing Mart, supra,* 116 *N.J.* at 746, 563 *A.*2d 31. We need not resolve the factual dispute over the dealership's alleged discriminatory practices at this juncture, other than to recognize that the LAD claim in this case remains a viable contested issue.

We review the trial court's decision rejecting the NAACP's standing on a *de novo* basis. *See People For Open Gov't, supra,* 397 *N.J.Super.* at 508, 938 *A.*2d 158. Applying such a *de novo* review standard, we vacate the trial court's premature ruling on standing, pending the fuller development of the relevant proofs and counter-proofs. The NAACP is therefore reinstated as a co-plaintiff in the litigation, at least at this time, subject to renewed consideration of its status if the LAD claim does not advance to trial.[19]

## IV.

In light of our determinations respecting the unenforceability of the arbitration provisions and the NAACP's standing, little needs to be said about the remaining issues raised on appeal. Those issues are either substantially mooted by our dispositions or warrant further examination by the trial court, this time with the participation of the NAACP as a co-plaintiff.

In particular, since we have found the arbitration provisions, including the class waiver clauses, to be too unclear and therefore invalid based upon common-law principles, we need not separately

[19] Even if, for the sake of discussion, the NAACP lacks standing in this case, that would not foreclose the NAACP's continued involvement in this matter as a potential *amicus curiae* under *Rule* 1:13–9.

consider whether they also transgressed the statutory plain-language requirements of the PLA. Likewise, we need not address whether those arbitration provisions, which we are not enforcing, violate the TCCWNA or the LAD. Finally, we decline to evaluate whether this lawsuit meets the requirements for class certification under *Rule* 4:32, as that question must first be decided in the trial court following a proper motion for certification. *See Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973) (noting our general preference to refrain from deciding issues that were not decided in the trial court).

## V.

For the reasons we have set forth, the various orders of the trial court are affirmed in part, in accordance with *AT&T Mobility;* reversed in part; and remanded in part for further proceedings. Jurisdiction is not retained.