**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3269-23

ESTATE OF NAFIZIA RUGBEER,
by CHRISTOPHER RUGBEER,
Administrator, and CHRISTOPHER
RUGBEER, Administrator of the
ESTATE OF NAFIZIA RUGBEER,

    Plaintiffs-Respondents,

v.

KAMRAN KHAZAEI, M.D., and
NOUVELLE CONFIDENCE,
THE CENTER FOR
COSMETIC LASER AND
REJUVENATION,

    Defendants-Appellants,

and

KIEL KELLEY, C.R.N.A.,[1]

    Defendant.

_____

Argued February 6, 2025 – Decided March 10, 2025

---

[1] Defendant Kiel Kelley did not join the motion to compel arbitration at issue in this action and is not participating in this appeal.

Before Judges Mawla, Natali, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-1600-23.

David M. Kupfer argued the cause for appellants Kamran Khazaei, M.D., and Nouvelle Confidence, LLC (Kennedys CMK, LLP, attorneys; David M. Kupfer, of counsel and on the briefs; Sean P. Shoolbraid, on the briefs).

William O. Crutchlow argued the cause for respondent Estate of Nafizia Rugbeer (Eichen Crutchlow Zaslow, LLP, attorneys; William O. Crutchlow, of counsel and on the briefs; Gary G. Minassian, on the briefs).

Paul M. da Costa argued the cause for amicus curiae New Jersey Association for Justice (Sarno da Costa D'Aniello Maceri, LLC, attorneys; Paul M. da Costa, of counsel and on the brief).

Catherine Flynn argued the cause for amicus curiae The American Medical Association and The Medical Society of New Jersey (Flynn Watts, LLC, attorneys; Michael A. Moroney, on the brief).

PER CURIAM

Defendants Kamran Khazaei, M.D. and Nouvelle Confidence, LLC (Nouvelle Confidence) appeal from the May 14, 2024 order vacating a prior order compelling arbitration of plaintiffs' claim under the New Jersey Survival Act (the survival statute), N.J.S.A. 2A:15-3, and the June 20, 2024 order granting their motion for reconsideration and reaffirming the May 14 order. We

granted New Jersey Association for Justice, The American Medical Association, and The Medical Society of New Jersey leave to appear as amici curiae. We reverse and remand for the reasons expressed in this opinion.

I.

This medical malpractice action arises out of complications that occurred during a December 23, 2021, elective, cosmetic liposuction procedure performed on plaintiffs' decedent, Nafizia Rugbeer, by Dr. Khazaei at Nouvelle Confidence. Dr. Khazaei is an obstetrician-gynecologist who devotes a portion of his practice to cosmetic procedures, including liposuction.

On October 14, 2021, Rugbeer went to Nouvelle Confidence for her initial consultation with Dr. Khazaei. Rugbeer was provided with several forms, including a one-page "Standard Patient-Physician Arbitration Agreement" (the Arbitration Agreement). There is no dispute she signed the Arbitration Agreement on October 14, nor is there any dispute she was not provided with a copy of it that day.

The Arbitration Agreement provides:

> 1. It is understood that any dispute from medical services rendered by [Dr. Khazaei], Nouvelle Confidence and[/]or any physician nurse or person associated therewith shall be submitted to binding arbitrations and shall not be resolved by a court of law,

except as New Jersey law provides for judicial review or arbitration discussions.

I understand that a "dispute" means any unresolvable disagreement between the parties, including disputes over contract terms, as well as disputes over rendition of medical services alleged to be unnecessary, unauthorized or improperly, negligently, or incompetently performed. I specifically understand that by entering into this agreement, both parties voluntarily give up their constitutional right to have such a dispute decided by a court of law before a judge and jury.

2. ALL CLAIMS MUST BE ARBITRATED. I understand that all claims for damages arising from medical services rendered by Dr. Khazaei and[/]or Nouvelle Confidence, and/or any associate or substitute physicians, nurses or employee must be arbitrated. This includes any claim of a spouse, heir, child (born or unborn), or other successor in interest to any such claim[.]

3. ARBITRATION PANEL. I understand that I must submit a demand to arbitrate a dispute as defined by this agreement in writing. I also understand that within [thirty] days of my demand to arbitrate a dispute, the parties must agree on a panel of three arbitrators, one of which must be a medical doctor. A list of suggested arbitrators shall be supplied by the medical provider upon receipt of the demand to arbitrate. Should the parties be unable to agree upon the arbitration panel within the [thirty] days allotted, the medical provider shall make the final decision regarding the panel members. It is further understood that each party shall bear their own costs, including the cost of their own legal counsel, as well as any other expenses incurred

4

for their own benefit.  Each party shall bear their pro rata share of all other arbitration costs, including, but not limited of [sic] the cost to retain the arbitrators[.]

4.  ARBITRATION.  I UNDERSTAND THAT ANY DISPUTES ARE SUBJECT TO ARBITRATION BY THIS AGREEMENT.

5.  REVOCATION OF THE AGREEMENT.  This agreement may be revoked and cancelled by written notice delivered to Dr. Khazaei and/or the Nouvelle Confidence within [thirty] days of the signing of this agreement.  If notice of revocation of this of this [sic] agreement is not received within [thirty] days of the signing, the right to cancel the agreement is forever waived.

6.  RETROACTIVE EFFECT.  If the signing party intends this agreement to cover all services rendered before the date of the signing of this agreement (including, but not limited to, prior consultations or treatment), the signing party must initial here: _____

7.  ACKNOWLEDGEMENT[.]  By signing this agreement, I acknowledge that I have discussed to my satisfaction any questions I may have had regarding the arbitration agreement with a member of the [Dr. Khazaei] or Nouvelle Confidence, staff, and have been given the opportunity to obtain further counsel if desired.  I acknowledge that I have freely negotiated all terms herein set forth.

8.  If any provision of this arbitration agreement should be held invalid or unenforceable, the remaining provisions shall remain in full force and shall not be affected by the invalidity of any other provision.

A-3269-23

NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OR MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.

On October 28, 2021, Rugbeer returned to Nouvelle Confidence. She did not meet with Dr. Khazaei during that visit. She received an eight-page "Tumescent Liposuction Patient Information Booklet" and signed an acknowledgement that she received that booklet. She also signed a Financial Agreement and paid a $500 "Lipo[suction] Deposit." The Financial Agreement indicated the "D.O.S." (date of surgery) was December 23, 2021. According to Dr. Khazaei, Rugbeer was given "a booklet" of all the documents she signed on October 14 and October 28, including the Arbitration Agreement, during the office visit on October 28.

On December 20, Rugbeer returned to Nouvelle Confidence and met with Dr. Khazaei for a pre-operative examination and "medical clearance for liposuction scheduled for" December 23, 2021. On December 23, approximately twenty to thirty minutes into the procedure, complications developed, and resuscitation efforts were initiated. Rugbeer was transported to the hospital and died the following day.

A-3269-23

On May 18, 2023, the Estate of Nafizia Rugbeer filed a two-count complaint against defendants and Nurse Kelley alleging causes of action under the survival statute and the Wrongful Death Act, N.J.S.A. 2A:31-1 to -6. Defendants moved to stay the action in favor of arbitration. On September 8, 2023, the court entered an order staying the action "for [thirty] days for limited discovery relating to formation of [the A]rbitration [A]greement only."

The parties conducted discovery as ordered by the court, including the deposition of Dr. Khazaei. He testified that since 2004 he has used some form of an arbitration agreement for his elective, cosmetic surgical cases, such as liposuction. He began using the agreements because he was advised to do so "in the courses and seminars and [his] trainings . . . for cosmetic surgery." He obtained the Arbitration Agreement at a seminar and began using it in 2016. He did not make any substantive changes to it. Dr. Khazaei testified he knows what arbitration is, but he is not a lawyer, and his understanding of the Arbitration Agreement is based on the language in the form.

When patients arrive at his office for an initial consultation, they are presented with documents to sign, including the Arbitration Agreement. "Two [of these] forms are signed by [him], one is arbitration and one is the history, physical, and the consultation. Those [he] go[es] over again." The Arbitration

Agreement and the history form are separated from the other forms by a paperclip. The surgical coordinator tells the patient those forms "are separate. [Dr. Khazaei] is going to go over these with you, these two."

"In the [treatment] room[, he] ask[s the patient] to read [the Arbitration Agreement] and sign it, and once they sign, [he] sign[s] it." He has "the patients read it and make[s] sure they understand it. . . . [He] go[es] over it and make[s] sure and ask[s] them if they read it, understood it, [and] is it their signature. [He] sign[s] it after that." If the patient signed the form in the waiting room, he "confirm[s] that this is what they[ have] read, understood, and signed, and then [he] signs it too, . . . with the patient."

Dr. Khazaei "went over the [Arbitration Agreement] with [Rugbeer] on October 14" in the treatment room. He "asked her to read [the Arbitration Agreement], understand it, and if she agree[d], to sign it." She wrote her name at the top of the Arbitration Agreement acknowledging she "read this [Arbitration A]greement in its entirety and underst[ood] and agree[d] to [it]." Dr. Khazaei saw her read the Arbitration Agreement and sign her name. He then signed the Arbitration Agreement. "She seemed mature and well-spoken in English and educated" and "read and wrote in English." She also read the other forms and "wrote the demographics in English. She wrote everything." After

Rugbeer signed the Arbitration Agreement, it was scanned electronically, and the original was shredded.

Dr. Khazaei was the only person in the office who would have spoken with Rugbeer about the Arbitration Agreement. He did not "specifically recall" discussing the Arbitration Agreement with her, but he "tell[s] that to every patient." If a patient does not read, understand, and approve the Arbitration Agreement, he would not perform any procedures on them.

On October 28, Rugbeer saw Dr. Khazaei's surgical coordinator and was provided with a "hard copy, document copy of the [A]rbitration [A]greement." She also received the tumescent liposuction patient information booklet and signed an acknowledgment that she received that document. "When they come to pick up the information, [the A]rbitration [Agreement] is provided to the patient." There is no separate written acknowledgment she received a copy of the Arbitration Agreement on October 28, but "[i]t[ is] part of the booklet that is provided[,] . . . everything is provided to the patient except [Dr. Khazaei's] history and physical, the consultation part." "[S]he would have been given a booklet that . . . included the [A]rbitration [A]greement . . . ." Referring to the separate tumescent liposuction patient information booklet, Dr. Khazaei

A-3269-23

testified "since it[ is] []new . . . you know, it[ is] written, but everything else is part of the booklet that is provided to the patient."

On December 20, Dr. Khazaei saw Rugbeer for a pre-operative "physical exam."  At that time, he asks if the patient "read all the papers provided," and if they "reviewed[ed] the arbitration?  Everything is okay?"  "If it[ is] not yes, then [he] would know."

Following the completion of arbitration discovery, the court relisted the motion, permitted supplemental briefing, and heard oral argument.  On March 21, 2024, plaintiffs filed a motion for leave to file an amended complaint to assert a cause of action for wrongful death on behalf of Christopher Rugbeer individually, and as an heir to the Estate of Nafizia Rugbeer.

On March 22, 2024, the court entered an order granting defendants' motion to stay the litigation in favor of arbitration and dismissing plaintiffs' wrongful death claim without prejudice, supported by a written opinion.  The court found Rugbeer signed the Arbitration Agreement, and it is "binding on all claims made by [her] Estate."  It found "[t]he [A]rbitration [A]greement . . . does not deprive the Estate of Rugbeer from making a claim, it only specifies the forum in which claims on behalf of the Estate of Rugbeer may be brought."  It determined "[e]nforcing the [A]rbitration [A]greement here would not be unconscionable."

10

The court dismissed the wrongful death claim without prejudice because the Estate was the only named plaintiff and could not assert a claim for wrongful death. It made "no ruling as to if a [w]rongful [d]eath claim brought by a party who holds such claim may or may not be subject to arbitration."

Shortly after, responsibility for the case was assigned to the motion judge in the normal course. On April 26, the motion judge conducted a conference because he "reviewed the [o]rders and . . . had an issue with the prior [o]rder entered by [his predecessor judge] and . . . was having [the] conference to avoid surprise to the parties, and . . . [wanted] additional briefing on it." On May 10, after receiving the parties' supplemental submissions, the motion judge heard oral argument on plaintiffs' motion for leave to file a first amended complaint.

On May 14, the motion judge entered an order granting plaintiffs leave to file a first amended complaint and restoring the "matter . . . to the trial calendar in its entirety." He found:

> In the first instance, [Rugbeer] sought specialized services with regard to her cosmetic issues. It was reasonable for her to assume that [Dr. Khazaei] would act in her best interest. While the contract provided her with a thirty-day period to review the [Arbitration A]greement, it appears undisputed that the [Arbitration A]greement was withheld from her for a portion of that period—from October 14 [to] October 28. In addition, on October 28 she was seen by staff, who would not have discussed the terms of the [Arbitration

A]greement with her. The [Arbitration Agreement] was, according to [Dr. Khazaei], part of the tumescent liposuction patient information booklet provided on October 28, but even a cursory examination of that booklet reveals that it was paginated [one] of [eight] through [eight] of [eight] and the [A]rbitration [A]greement has no page number upon it. In addition, the booklet has a revision . . . footer . . . upon all pages that is not present on the [A]rbitration [A]greement. Furthermore, a review of the receipt for documents signed by [Rugbeer] on October 28 acknowledges that she had "received a copy of the [t]umescent [l]iposuction [p]atient [i]nformation [b]ooklet[.]" No other document is referenced as being received.

The motion judge also noted Dr. Khazaei "was the only one to explain the [Arbitration A]greement to [Rugbeer] and answer her questions during the execution of the [Arbitration A]greement. However, [Dr. Khazaei] could not explain what the [Arbitration A]greement meant at his deposition."

The motion judge found "the most judicially shocking aspect of the transaction is the terms of the [Arbitration A]greement itself." Specifically, that it

applies to persons who are not parties to the [Arbitration A]greement. It provides that the [Arbitration A]greement applies to "any physician or nurse or person associated" with [Dr. Khazaei]. It does not define what it means to be "associated with" [Dr. Khazaei]. Accordingly, while [Rugbeer] may be bound to arbitrate her claims against these unidentified persons, they are not bound to arbitrate their claims

12

against her, as they are not parties to the [Arbitration A]greement.

He further found the Arbitration Agreement provides Dr. Khazaei with complete control over the arbitration panel. Pursuant to the terms of the Arbitration Agreement, "all [Dr. Khazaei] has to do is disagree regarding the composition of the panel, and he gets to pick the entire panel."

> Furthermore, the traditional basis for appointing three arbitrators recognizes that a party is going to pick an arbitrator likely to favor them in some fashion. Typically, each side picks one, and then those two arbitrators choose the third. There is no explanation provided for this extraordinary deviation from custom. In addition, while not fatal to the [Arbitration A]greement, the [Arbitration A]greement does not provide for the forum or applicable rules of the arbitration. It also does not provide for minimum qualifications of the arbitrators, other than to provide that one must be a medical doctor.

The motion judge determined "the [Arbitration A]greement also sets forth a proposition that must be false based upon [Dr. Khazaei's] testimony." He found the Arbitration Agreement provides Rugbeer "discussed to [her] satisfaction any questions [she] may have had regarding the [A]rbitration [A]greement with a member of" Nouvelle Confidence staff. "However, [Dr. Khazaei] testified that he was the only person to discuss the [Arbitration

13

A]greement with the patients. Accordingly, a patient could not have discussed the [Arbitration A]greement to their satisfaction with the staff."

The motion judge also found the Arbitration Agreement provided that disputes would be decided by "'neutral arbitration,'" but that was false because Dr. Khazaei "completely controls the composition of the arbitration panel." That "establishes a false portrayal of the posture of the [Arbitration A]greement to the patient – which is compounded by the position of trust and confidence held by [Dr. Khazaei]."

The motion judge found

> [t]he [t]erms of the [A]rbitration [A]greement shock the judicial conscience. The unconscionability is so severe and pervasive in the [Arbitration A]greement to be beyond judicial reformation by excision. In addition, the circumstances of the execution of the [Arbitration A]greement and the presentation of the [Arbitration A]greement to [Rugbeer] are procedurally unconscionable.

He concluded, "[p]laintiff has established by a preponderance of the evidence that the [A]rbitration [A]greement is unenforceable. The prior order(s) of the court to the contrary are vacated. The survivorship claim is returned to the trial calendar." The court granted plaintiffs' motion to file a first amended complaint and did not address defendants' claim the wrongful death claim is also

subject to arbitration because his "decision on the validity of the [A]rbitration [A]greement disposes of that argument."

On June 3, defendants filed a motion for reconsideration pursuant to Rule 4:49-2. On June 20, the motion judge heard oral argument and entered an order granting the motion for reconsideration but reaffirming his May 14 order supported by an oral opinion. On June 24, defendants appealed from the May 14 and June 20 orders.

On appeal, defendants argue: (1) the motion judge lacked jurisdiction to reconsider and reverse the March 22 order; (2) the Arbitration Agreement should be enforced even if it is a contract of adhesion; (3) the Arbitration Agreement is not procedurally unconscionable; (4) the selection of arbitrators provision does not shock the conscience such that it is substantively unconscionable; (5) if the selection provision is unconscionable, it can be severed from the remainder of the agreement; and (6) the Arbitration Agreement need not have been explained to Rugbeer to be enforceable.

## II.

Plaintiffs' argument defendants' appeal from the May 14, 2024 order is untimely is not persuasive. The May 14 order effectively denied defendants' motion to stay the litigation in favor of arbitration. Although it was not a final

judgment, it was appealable as of right pursuant to <u>Rule</u> 2:2-3(b)(8). Defendants had forty-five days to file a notice of appeal. <u>See</u> <u>R.</u> 2:4-1(a).

On June 3, twenty days after entry of the May 14 order, defendants timely filed a motion for reconsideration pursuant to <u>Rule</u> 4:49-2. Because that motion was timely filed, it tolled the time to appeal from the May 14 order. <u>See</u> <u>R.</u> 2:4-3(e). At that point, defendants had another twenty-five days to file the appeal. On June 20, the court entered the order denying defendants' motion for reconsideration and defendants' remaining twenty-five days to appeal began to run. <u>See</u> <u>ibid.</u> They had until July 15 to appeal from the May 14 order. On June 24, defendants timely filed their notice of appeal.

## III.

We conclude the motion judge correctly determined the provision of the Arbitration Agreement relating to the selection of arbitrators is unconscionable and unenforceable. That provision, however, is properly severable from the remaining provisions of the Arbitration Agreement. Without that provision, the Arbitration Agreement is enforceable.

## A.

The enforceability of an arbitration agreement is a question of law, which we review de novo. <u>Skuse v. Pfizer, Inc.</u>, 244 N.J. 30, 46 (2020). "Similarly,

the issue of whether parties have agreed to arbitrate is a question of law that is reviewed de novo." Jaworski v. Ernst & Young U.S. LLP, 441 N.J. Super. 464, 472 (App. Div. 2015).

Under both the Federal Arbitration Act (FAA), 9 U.S.C. § 1-16, and New Jersey Arbitration Act (NJAA), arbitration is fundamentally a matter of contract. 9 U.S.C. § 2; NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 424 (App. Div. 2011). Arbitration agreements are subject to customary contract law principles. Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 442 (2014). A valid and enforceable agreement requires: (1) consideration; (2) a meeting of the minds based on a common understanding of the contract terms; and (3) unambiguous assent. See id. at 442-45. Consequently, to be enforceable, the terms of an arbitration agreement must be clear, and any legal rights being waived must be identified. Id. at 442-43; see also Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 319-20 (2019). "[C]ontract terms should be given their plain and ordinary meaning." Kernahan, 236 N.J. at 321 (citing Roach v. BM Motoring, Inc., 228 N.J. 163, 174 (2017)).

"No particular form of words is necessary to accomplish a clear and unambiguous waiver of rights." Atalese, 219 N.J. at 444. If, "at least in some

A-3269-23

general and sufficiently broad way," the language of the clause conveys that arbitration is a waiver of the right to bring suit in a judicial forum, the clause will be enforced. Id. at 447; see also Morgan v. Sanford Brown Inst., 225 N.J. 289, 309 (2016) ("No magical language is required to accomplish a waiver of rights in an arbitration agreement.").

"In reviewing such orders, we are mindful of the strong preference to enforce arbitration agreements, both at the state and federal level." Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 186 (2013). The FAA and "the nearly identical [NJAA], enunciate federal and state policies favoring arbitration." Atalese, 219 N.J. at 440 (citations omitted). That preference, "however, is not without limits." Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 132 (2001). "[T]he FAA 'permits states to regulate . . . arbitration agreements under general contract principles,' and a court may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of any contract.'" Atalese, 219 N.J. at 441 (quoting Martindale v. Sandvik, Inc., 173 N.J. 76, 85 (2002)).

"The first step in considering [a] challenge to enforcement of an arbitration requirement must be to determine whether a valid agreement exists." Martindale, 173 N.J. at 83; see also N.J.S.A. 2A:23B-6(b). In determining

validity, "arbitration agreements may not be subjected to more burdensome contract formation requirements than that required for any other contractual topic." Martindale, 173 N.J. at 83. As such, "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]," and in New Jersey, "[i]t is well settled that courts 'may refuse to enforce contracts that are unconscionable.'" Muhammad v. Cnty. Bank of Rehoboth Beach, 189 N.J. 1, 12, 15 (2006) (emphasis omitted) (first quoting Dr.'s Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996); and then quoting Saxon Constr. & Mgmt. Corp. v. Masterclean of N.C., Inc., 273 N.J. Super. 231, 236 (App. Div. 1994)).

A contract of adhesion is "[a] contract where one party . . . must accept or reject the contract." Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353 (1992) (alteration in original) (quoting Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 104 (1980)). "[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." Muhammad, 189 N.J. at 15 (quoting Rudbart, 127 N.J. at 353).

"The determination that a contract is one of adhesion, however, 'is the beginning, not the end, of the inquiry . . . .'" Ibid. (quoting Rudbart, 127 N.J. at 354). A contract of adhesion is not by its nature alone unenforceable. Rudbart, 127 N.J. at 354. The burden of proving the defense of unconscionability is on the party challenging the enforceability of the agreement. Martindale, 173 N.J. at 91.

In Delta Funding Corp. v. Harris, our Supreme Court stated,

> [t]he defense of unconscionability, specifically, calls for a fact-sensitive analysis in each case, even when a contract of adhesion is involved. [Muhammad, 189 N.J. at 15-16]. This Court has recognized that contracts of adhesion necessarily involve indicia of procedural unconscionability. Id. at 15. We have identified, therefore, four factors as deserving of attention when a court is asked to declare a contract of adhesion unenforceable. [Rudbart, 127 N.J. at 356].

>> [I]n determining whether to enforce the terms of a contract of adhesion, [we] look[] not only to the take-it-or-leave-it nature or the standardized form of the document but also to [(1)] the subject matter of the contract, [(2)] the parties' relative bargaining positions, [(3)] the degree of economic compulsion motivating the "adhering" party, and [(4)] the public interests affected by the contract.

>> [Quoting ibid. (alterations in original).]

20

The <u>Rudbart</u> factors focus on the procedural and substantive aspects of a contract of adhesion in order to determine whether the contract is so oppressive, <u>Martindale</u>, 173 N.J. at 90, or inconsistent with the vindication of public policy, <u>Muhammad</u>, 189 N.J. at 25, that it would be unconscionable to permit its enforcement. Courts generally have applied a sliding-scale approach to determine overall unconscionability, considering the relative levels of both procedural and substantive unconscionability. <u>See</u> <u>Sitogum Holdings, Inc. v. Ropes</u>, 352 N.J. Super. 555, 565-66 (Ch. Div. 2002); <u>see also</u> <u>Muhammad</u>, 189 N.J. at 14 n.2 (noting appropriateness of sliding-scale analysis for contracts of adhesion).

[189 N.J. 28, 39-40 (2006) (internal citations omitted).]

The first three <u>Rudbart</u> factors speak to procedural unconscionability, and the last factor speaks to substantive unconscionability. <u>Rodriguez v. Raymours Furniture Co., Inc.</u>, 225 N.J. 343, 367 (2016). Procedural unconscionability arises out of defects in the process by which the contract was formed and "can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." <u>Id.</u> at 366 (quoting <u>Muhammad</u>, 189 N.J. at 15). Substantive unconscionability "generally involves harsh or unfair one-sided terms"; it "simply suggests the exchange of obligations so one-sided as to shock the court's conscience." <u>Rodriguez v. Raymours</u>

21

Furniture Co., Inc., 436 N.J. Super. 305, 317 (App. Div. 2014), rev'd, 225 N.J. 343 (2016) (quoting Sitogum, 352 N.J. Super. at 565).

The public interest factor is the most important in determining whether a contract of adhesion is unconscionable. Rudbart, 127 N.J. at 356; see also Muhammad, 189 N.J. at 19. This factor requires the court "to determine whether the effect of the arbitration clause provisions that significantly restrict discovery, limit compensatory damages, and prohibit punitive damages 'shield defendant[] from compliance with the laws of this State.'" Est. of Ruszala ex rel. Mizerak v. Brookdale Living Cmtys., Inc., 415 N.J. Super 272, 298 (App. Div. 2010) (quoting Muhammad, 189 N.J. at 19).

## B.

We are satisfied the Arbitration Agreement is a contract of adhesion. It was presented to Rugbeer "on a take-it-or-leave-it basis . . . in a standardized printed form, without opportunity for the 'adhering' party to negotiate." See Muhammad, 189 N.J. at 15 (quoting Rudbart, 127 N.J. at 353). We must therefore scrutinize the Arbitration Agreement applying the Rudbart factors.

## C.

The motion judge correctly determined the provision in the Arbitration Agreement relating to the selection of arbitrators (the selection provision) is

substantively unconscionable. The selection provision, comprised of two sentences in Article Three of the Arbitration Agreement states:

> A list of suggested arbitrators shall be supplied by the medical provider upon receipt of the demand to arbitrate. Should the parties be unable to agree upon the arbitration panel within the [thirty] days allotted, the medical provider shall make the final decision regarding the panel members.

As the motion judge appropriately found, the selection provision "provides [Dr. Khazaei] with complete control over the arbitration panel" and "all [Dr. Khazaei] has to do is disagree regarding the composition of the panel, and he gets to pick the entire panel." Arbitration is an alternative dispute resolution mechanism, not an opportunity to create an impenetrable barrier to tort claims and liability. See Ruszala, 415 N.J. Super. at 299 (finding restrictions on discovery, limits on compensatory damages, and prohibition of punitive damages created an "unconscionable wall of protection" against a "full measure of accountability").

The selection provision permits Dr. Khazaei to not only control the pool of potential arbitrators, but then vests in him complete control over the ultimate composition of the panel by simply refusing to agree with any arbitrators the patient selects. This harsh and unfair one-sided term is substantively unconscionable and, therefore, unenforceable.

A-3269-23

D.

The selection provision, however, is severable from the remainder of the Arbitration Agreement. When contractual terms "are clear, [courts] must enforce the contract as written." Graziano v. Grant, 326 N.J. Super. 328, 342 (App. Div. 1999) (citing Schenck v. HJI Assoc., 295 N.J. Super. 445, 450 (App. Div. 1996)). Severability clauses "are indicative of the parties' intent that the agreement as a whole survives the excision of an unenforceable provision." Arafa v. Health Express Corp., 243 N.J. 147, 169 n.2 (2020). The Arbitration Agreement contains a severability clause that provides, "[i]f any provision of this arbitration agreement should be held invalid or unenforceable, the remaining provisions shall remain in full force and shall not be affected by the invalidity of any other provision[.]" The plain language of the Arbitration Agreement permits severance of invalid or unenforceable provisions, such as the selection provision here.

Courts can sever an invalid provision of a contract unless striking the illegal provision "defeats the primary purpose of the contract." Jacob v. Norris, McLaughlin & Marcus, 128 N.J. 10, 33 (1992); Curran v. Curran, 453 N.J. Super. 315, 322 (App. Div. 2018). In making that assessment, we "must determine whether the unenforceability of th[e] provision[] renders the

remainder of the contract unenforceable." Jacob, 128 N.J. at 32; see also NAACP, 421 N.J. Super. at 437. Severance is permissible if striking the offending provision would leave behind a "clear residue that is manifestly consistent with the 'central purpose' of the contracting parties, and that is capable of enforcement." NAACP, 421 N.J. Super. at 437-38 (citing Jacob, 128 N.J. at 33).

The one-sided nature of the selection provision here can be cured by striking it from the contract based on the severability clause. In Flanzman v. Jenny Craig, Inc., 244 N.J. 119, 140-41 (2020), our Supreme Court held the "omission of a designated arbitral institution or general process for selecting an arbitration mechanism or setting" does not "warrant the invalidation of an arbitration agreement." The court continued,

> [g]iven the availability of many skilled and experienced arbitrators – some affiliated with an arbitration organization and some not – parties may choose to refrain from designating an arbitrator or arbitration organization until a dispute arises. Should the parties prove unable to or unwilling to agree upon an arbitrator, the court may exercise its appointment authority in accordance with N.J.S.A. 2A:23B-11 on the application of either party and the designated arbitrator may conduct the arbitration in accordance with . . . N.J.S.A. 2B:23B-15.
>
> [Id. at 141.]

See also Perez v. Sky Zone, 472 N.J. Super. 240, 249 (App. Div. 2022) (unavailability of designated arbitration organization did not render the arbitration agreement unenforceable).

Pursuant to Flanzman and Perez, the Arbitration Agreement is enforceable without the selection provision. It is, therefore, severable from the remainder of the Arbitration Agreement because it "leaves behind a clear residue that is manifestly consistent with the 'central purpose' of the contracting parties, and that is capable of enforcement." NAACP, 421 N.J. Super. at 437-38; see, e.g., Hojnowski v. Vans Skate Park, 187 N.J. 323, 342 (2006) (severing unconscionable exculpatory provision and enforcing agreement to arbitrate); Muhammad, 189 N.J. at 26 (severing unconscionable class action waiver provision and enforcing agreement to arbitrate); Ruszala, 415 N.J. Super. at 300 (severing unconscionable limitations of discovery and damages provisions and enforcing agreement to arbitrate).

## E.

Without the selection provision, the Arbitration Agreement is not unconscionable. We are not persuaded by the contention arbitration agreements in medical malpractice cases should be deemed against public policy. This

argument was expressly addressed and rejected in <u>Moore v. Woman to Woman Obstetrics & Gynecology, LLC</u>, 416 N.J. Super. 30 (App. Div. 2010).

In <u>Moore</u>, the plaintiff signed an arbitration agreement on her first visit to her obstetrician in connection with a high-risk pregnancy. <u>Id.</u> at 41. The "receptionist gave [her] a clipboard with forms she was to complete." <u>Ibid.</u> One of the forms was an arbitration agreement. <u>Ibid.</u> "No one brought her attention to the arbitration agreement," and she "was not given a copy of the agreement after she signed it or when she left the office." <u>Ibid.</u>

We noted "[t]he Legislature's approval of arbitration agreements is broad." <u>Id.</u> at 35. Specifically, "[s]ubsection a of N.J.S.A. 2A:23B-6 provides: 'An agreement . . . to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract.'" <u>Ibid.</u> (emphasis omitted). "This provision clearly encompasses pre-dispute agreements to arbitrate," and the New Jersey Arbitration Act "does not prohibit agreements to arbitrate based upon the nature of the disputed claim." <u>Ibid.</u> We concluded:

> Considering the breadth of the [factors to be considered under <u>Muhammad</u> and <u>Rudbart</u>] relevant to enforcement of an agreement to arbitrate, the policies upon which plaintiffs . . . rely to urge adoption of a per

se rule barring pre-dispute agreements to arbitrate claims of medical malpractice are reasonably addressed by the case-by-case approach the Legislature has directed. For that reason, we see no justification for judicial action imposing an absolute bar to enforcement of agreements to arbitrate such claims. The question is best left to the Legislature.

[Id. at 40.]

We see no reason to deviate from our decision in Moore. Applying the factors set forth in Muhammad and Rudbart, we are satisfied the Arbitration Agreement is enforceable. To be sure, because the Arbitration Agreement is a contract of adhesion, there is some "indicia of procedural unconscionability." Muhammad, 189 N.J. at 15. Likewise, Rudbart factor two – the parties' relative bargaining power – leans in favor of plaintiffs. However, "unequal bargaining power does not preclude enforcement of [an] arbitration provision." Young v. Prudential Ins., 297 N.J. Super. 605, 620 (App. Div. 1997) (citing Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991)).

The first Rudbart factor – the subject matter – here involves the provision of elective, cosmetic medical services. As we found in Moore, the provision of medical services is amenable to arbitration agreements. 416 N.J. Super. at 44-46. Arbitration has long been considered a "favored means of dispute resolution," Hojnowski, 187 N.J. at 342, and we discern no basis to invalidate

an agreement to select arbitration as the forum to resolve medical malpractice claims arising from elective, cosmetic procedures.

The third factor – economic compulsion – weighs against a finding of unconscionability. This was an elective, cosmetic procedure. There was no need for the procedure and no compulsion motivating the "adhering" party, economic or otherwise.

The fourth factor – the public interests affected – also weighs in favor of enforceability. The public interest factor is the most important in determining whether a contract of adhesion is unconscionable. Rudbart, 127 N.J. at 356; see also Muhammad, 189 N.J. at 19. This factor requires the court "to determine whether the effect of the arbitration clause provisions that significantly restrict discovery, limit compensatory damages, and prohibit punitive damages 'shield defendant[] from compliance with the laws of this State.'" Ruszala, 415 N.J. Super. at 298 (quoting Muhammad, 189 N.J. at 19).

As we discussed previously, public policy favors arbitration agreements, including in healthcare settings. See Moore, 416 N.J. Super. at 45. In addition, the Arbitration Agreement does not impose any restrictions on liability or damages recoverable in arbitration, nor does it in any way restrict discovery.

The Arbitration Agreement merely designates arbitration as the mechanism to resolve any disputes.

There is no evidence of any inadequacies due to Rugbeer's "age, literacy, [or] lack of sophistication." See Sitogum, 352 N.J. Super. at 564-65. Dr. Khazaei testified she "seemed mature and well-spoken in English and educated" and "read and wrote in English." She also "wrote the demographics in English. She wrote everything."[2] There is no evidence of "hidden or unduly complex contract terms," and nothing about defendants' "bargaining tactics, and the particular setting existing during the contract formation process," id. at 564, lead us to find "overwhelming procedural unconscionability," Moore, 416 N.J. Super. at 39.

Plaintiffs' claim, adopted by the motion judge, defendants did not provide a copy of the Arbitration Agreement to Rugbeer on October 28 is contradicted by the only competent evidence in the record. Dr. Khazaei testified that during her office visit on October 28, Rugbeer was given a "booklet" of all the forms she signed on October 14 and October 28. He did not, as the motion judge

---

[2] Plaintiffs allege for the first time on appeal Rugbeer was "dyslexic and functionally illiterate." There is no evidence in the record to support such a claim and no such evidence was developed during arbitration discovery. In fact, Dr. Khazaei's testimony and Rugbeer's written responses on the forms she reviewed and completed indicate otherwise.

indicated, testify the Arbitration Agreement she signed on October 14 was part of the tumescent liposuction patient information booklet she received and acknowledged on October 28. Dr. Khazaei's reference to a "booklet" was to the package of documents she was given on October 28, not to the tumescent liposuction patient information booklet.[3]

Rugbeer had ample time to review and consider the Arbitration Agreement after receiving it on October 28. In accordance with the Financial Agreement, she could cancel the procedure without penalty up to fourteen days before the procedure, which would have been December 9. After receiving a copy of the Arbitration Agreement on October 28, she had more than the thirty days permitted to cancel the procedure.

We are also not convinced by plaintiffs' claim, again accepted by the motion judge, the Arbitration Agreement "sets forth a proposition that must be false based upon [Dr. Khazaei's] testimony." Specifically, Rugbeer "discussed to [her] satisfaction any questions [she] may have had regarding the

_____

[3] In fairness to the motion judge, the deposition was chaotic, and the transcript is confusing as a result. For example, plaintiffs' counsel repeatedly asked Dr. Khazaei the same questions drawing well-founded objections and resulting in discussions between counsel that went on for pages. If such conduct occurs in the future, counsel should seek intervention from the arbitration panel or the court as appropriate.

[A]rbitration [A]greement with a member of . . . Nouvelle Confidence staff." Dr. Khazaei did not, as plaintiffs contend, testify he did not understand the Arbitration Agreement. Rather, he testified he understood what arbitration is and his understanding of the Arbitration Agreement is based on the plain language of the contract. Moreover, there is no evidence Rugbeer had any questions that went unanswered. The only competent evidence in the record demonstrates she read and understood the Arbitration Agreement and did not have any questions about it.

We are not persuaded by the claim the Arbitration Agreement purports to compel Rugbeer to arbitrate claims against medical personnel "associated" with defendants. The only person who might fall within that category is Nurse Kelley, who did not join defendants' motion to compel arbitration.

F.

We are satisfied the Arbitration Agreement meets the standards of Atalese and its progeny. It clearly and unambiguously evidences a waiver of Rugbeer's right to pursue any claims against defendants in a judicial forum and obligates plaintiffs to resolve all claims through arbitration. The Arbitration Agreement is a stand-alone, single-page form. It was specifically brought to Rugbeer's attention and separately reviewed with her by Dr. Khazaei on October 14 and

A-3269-23

December 20.  The Arbitration Agreement is written in plain, easy to understand language and clearly explains Rugbeer waived her right to have any claims tried in a judicial forum before a jury.

We reverse the May 14, 2024 order and remand for entry of an order staying the survival act claim and compelling arbitration in accordance with this opinion.  The selection provision shall be severed from the Arbitration Agreement.[4]  In the event the parties cannot agree upon an arbitration panel, "the court may exercise its appointment authority in accordance with N.J.S.A. 2A:23B-11 on the application of either party."  Flanzman, 244 N.J. at 141.  We do not express any opinion on the arbitrability of the wrongful death claim because that issue was not addressed in the trial court or raised on appeal.

To the extent we have not specifically addressed any remaining arguments, including defendants' argument the court lacked authority to vacate the March 22 order, it is because they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

---

[4]  The following language shall be excised from Article Three:  "A list of suggested arbitrators shall be supplied by the medical provider upon receipt of the demand to arbitrate.  Should the parties be unable to agree upon the arbitration panel within the [thirty] days allotted, the medical provider shall make the final decision regarding the panel members."

A-3269-23